1999 OK CR 49

Richard Stephen **FAIRCHILD**, Appellant.

v.

**STATE of Oklahoma, Appellee.**

No. F–96–121.

Court of Criminal Appeals of Oklahoma.

Dec. 7, 1999.

As Corrected on Denial of Rehearing
May 11, 2000.

Sandra Stensaas, Pattye Wallace, Oklahoma County Assistant District Attorneys, Oklahoma City, for the State at Trial.

John Albert, Assistant Public Defender Office of Public Defenders, Oklahoma City, for Defendant at Trial.

Lee Ann Jones Peters, Appellate Defense Counsel, Capital Direct Appeals Division,Oklahoma Indigent Defense System, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

### OPINION ON REHEARING

LILE, Judge:

¶ 1 This Opinion is issued following this Court's order which granted Appellant's Petition for Rehearing and withdrew the original Opinion herein dated August 20, 1998.

¶ 2 Richard Stephen Fairchild was tried by jury and convicted of Murder in the First Degree, 21 O.S.1991, § 701.7(C), in Oklahoma County District Court Case No. CF–93–7103. The jury found one aggravating circumstance, that the murder was especially heinous, atrocious or cruel, and set punishment at death. The Honorable Major Wilson, District Judge, imposed the death sentence. The Appellant is before the Court on original appeal.

¶ 3 Three-year-old Adam Broomhall, who weighed 24 pounds, died as a result of brain damage caused when he was thrown against the vertical surface of the folded-down wing of a drop-leaf table by his mother's live-in boyfriend, Richard Stephen Fairchild. The injury occurred in the early morning hours of Sunday, November 14, 1993, while Adam's mother, Stacy Broomhall, was asleep in the bedroom. Adam never regained consciousness and he died later that morning. Fairchild had been living with Stacy and her three children in Midwest City.

¶ 4 The day before Adam was killed, Fairchild and Stacy drank beer most of the afternoon and evening. Fairchild told police he had started drinking beer about 2:00 p.m. and had consumed about twelve cans of beer by 9:00 p.m. That evening they visited Stacy's mother, Jena Fickland, who lived in north Oklahoma City. The children watched TV and ate snacks in one room while the adults watched TV and drank beer in another. When Fairchild and Stacy were ready to leave, Fickland insisted they were both too intoxicated to drive and arranged for her seventeen-year-old daughter, Charity Wade, to drive them home.

¶ 5 Originally Ms. Wade planned to stay overnight at Fairchild's and Stacy's residence. These plans changed when Fairchild made sexual advances toward her. She put the kids to bed and called a cab to take her home. Fairchild got angry and got out a baseball bat. He told Charity that if someone other than a cab driver came to pick her up, he was going to beat him to death. He tried to grab her arm and told her she wasn't leaving. She was finally able to leave in the cab sometime before 10:30 p.m. She had

checked on Adam before she left, and he was sleeping in his bed.

¶ 6 Approximately three hours later, Adam woke up crying and got out of bed. Fairchild told Adam to "hush it up" and struck him in the mouth, rupturing the inside of his upper lip. Adam still did not stop crying. Fairchild then held Adam's chest and then his buttocks up against a hot wall heater. Adam suffered severe second-degree grid-patterned burns on his chest and bottom, and was now screaming.

¶ 7 Fairchild admitted to Detective Burton a couple of days later, "I think I pushed him up against the heater and held him up there," and, "The more he screamed, the more I just kept on hitting him." Another blow struck Adam's left ear and ruptured his eardrum. Finally, Fairchild threw Adam against the drop-leaf dining table, and when Adam hit the floor, he stopped screaming. He also stopped breathing.

¶ 8 Fairchild went in the bedroom, woke up Stacy Broomhall, and called 911. Paramedics arrived shortly and then the police. Fairchild claims he was intoxicated. However, he was not too drunk to write out a legible, detailed, coherent story in his own handwriting, claiming Adam was running in the house and "ran right into the table."

¶ 9 Adam was rushed to Children's Hospital in Oklahoma City where every effort to save his life failed, and he was pronounced dead later that morning. An autopsy established that injury to Adam's head had resulted in severe hemorrhaging and swelling in the right half of Adam's brain and had caused his death. Adam had sustained approximately twenty-six blows to his body including several to his head.

## PRETRIAL ISSUES

### A. Filing of the Bill of Particulars after First Arraignment

¶ 10 Appellant argues in Proposition VIII that the Bill of Particulars should not have been allowed by the trial court because the State failed to file it prior to or at District Court arraignment as required by *Hunter v. State*, 1992 OK CR 19, ¶ 5, 829 P.2d 64, 65.

¶ 11 The State did not originally seek the death penalty in this case. The first District Court arraignment took place on the same day as, and immediately after, Appellant was bound over at preliminary hearing. Two weeks before trial the State filed a motion to remand for further preliminary hearing for the stated purpose of alleging prior convictions. The trial court granted the State's motion. Thereafter, the State did file a Page Two to the Information, alleging two prior convictions. This resulted in no delay of the trial and there was no violation of 22 O.S. 1991, § 304. However, the next day, before the second District Court arraignment and ten days before the scheduled jury trial, the State filed a Bill of Particulars seeking the death penalty. Defense counsel requested, and was granted, a continuance of the jury trial setting.

¶ 12 Appellant claims that the filing of Page Two was a sham as it would serve no purpose in a murder case where the minimum sentence is life. The cases cited by Appellant are no longer applicable as they were decided before our present bifurcated trial procedure existed. In *Seibert v. State*, 1969 OK CR 205, ¶ 17, 457 P.2d 790, 794, we said that even if a defendant is facing a charge with a minimum sentence of life imprisonment, if there is a possibility that the court will instruct the jury on lesser included offenses at trial, it is proper for the State to file a Page Two alleging any former felony convictions. The trial should be bifurcated, and the Page Two would only be read to the jury in the second stage, if pertinent. *Id.*

¶ 13 This Court does not condone the State's delay in filing the Bill of Particulars. The appropriate remedy here, however, is not the striking of the Bill of Particulars. The *Hunter* decision turned on the Court's concern that the defendant must have sufficient time to prepare for trial. The Bill of Particulars in *Hunter* was filed within seven days of trial. 1992 OK CR 19, ¶ 5, 829 P.2d at 65. By granting Fairchild an adequate continuance upon his request in this case, the trial court prevented any error.

¶ 14 In a sub-proposition which we failed to address in our original Opinion,

Appellant claims he was denied a speedy trial by the late filing of the Bill of Particulars. He claims that this delayed the trial for a year and a half. We find, however, that much of the delay was not caused by the late filing. In considering his claim, we must consider the causes for the delay, the length of delay, whether the Appellant acquiesced in or contributed to the delay, and whether Appellant was prejudiced by the delay. *Barker v. Wingo*, 407 U.S. 514, 529–536; 92 S.Ct. 2182, 2191–95, 33 L.Ed.2d 101, 117–18 (1972); *Rainey v. State*, 1988 OK CR 65, ¶ 3, 755 P.2d 89, 90.

¶ 15 Appellant changed lawyers three times during that period, and each new lawyer needed adequate time to prepare for trial. Also, just days before the November 26, 1994, jury trial setting, Appellant's attorney filed an application to determine Appellant's competency. As a result, the case was continued. This resulted in several months delay, as the competency determination and post-examination competency hearing was not concluded until April 26, 1995.

¶ 16 Further, although Appellant claims he was "extremely prejudiced" by delay in the trial, he fails to demonstrate that prejudice. He claims he was not only "deprived of the counsel of his choosing, he was subjected to the death penalty and actually sentenced to die." He says nothing more about deprivation of counsel and therefore completely fails to explain or support that part of his assertion.

¶ 17 His claim that he was prejudiced because he was sentenced to death is wrong. To prevail with this argument he would have to show that improper delay caused the sentence. It did not. If he meant that the filing of the Bill of Particulars was a necessary, antecedent condition to his receiving the death penalty, he would be correct; but this would be true regardless of when it was filed. The delay did not cause the particular sentence imposed. The sentence of death resulted from the law, the facts, and the jury's decision in this case — not from a denial of speedy trial.

¶ 18 Considering that the length of time from the filing of charges to completion of trial was not inordinate, that Appellant con-tributed to the delay, and that he has shown no resulting prejudice from delay, we reject his proposition of error and find that he was not denied his constitutional right to a speedy trial. *Simpson v. State*, 1982 OK CR 35, ¶¶ 3–7, 642 P.2d 272, 274–75 (Simpson created further delay by filing his motion for psychiatric examination and commitment); *Stohler v. State*, 1988 OK CR 52, ¶¶ 4–5, 751 P.2d 1087, 1088–89 (Stohler was held in jail over three years before he was convicted).

## B. Competency to Stand Trial

¶ 19 The trial court granted the defense request for a competency evaluation and held a post-examination competency hearing. 22 O.S.1991, § 1175.4. In Proposition XVI, Appellant argues he was held to the unconstitutional standard of proving his lack of competency by clear and convincing evidence. *See Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). Fairchild is correct when he asserts this unconstitutional standard was in place at the time of his hearing and that it was applied to him.

¶ 20 Evidence at the post-evaluation competency hearing consisted of the parties' stipulation that the examining psychologist would testify Fairchild was competent to stand trial as indicated in the report filed with the court. Forensic psychologist Kelly Shannon, Ph.D., reported to the court that Fairchild was able to explain the allegations against him, that he voiced a "favorable opinion" toward his attorney, and had an "average" courtroom knowledge. He had no bizarre perceptions or beliefs regarding the legal process.

¶ 21 The psychologist concluded that in spite of a history of head injuries and chemical dependence, Mr. Fairchild was able to work with his attorney in a rational manner in his own defense. The only evidence supporting a finding of lack of competence came from statements by Fairchild's attorney to the effect he did not believe Fairchild could help adequately with his defense. Counsel gave no factual basis for this opinion, and no other evidence was presented. The trial court found Fairchild competent to stand trial.

¶ 22 Because Fairchild was subjected to the improper standard of proof, and since Appellant waived his right to jury trial on his post-examination competency hearing, this Court will conduct a de novo review on competency using the proper standard of proof. *See Ochoa v. State*, 1998 OK CR 41, ¶¶ 7–8, 963 P.2d 583, 590–91, and *Smith v. State*, 1996 OK CR 50, ¶ 11, 932 P.2d 521, 528. The proper standard of proof is a preponderance of the evidence: that more likely than not, Fairchild lacked competence to stand trial. The opinion of counsel, unsupported by any facts, does not meet this burden. Therefore, applying the correct standard of proof, we find Fairchild did not carry his burden to prove incompetence, and he was competent to stand trial.

### FIRST STAGE ISSUES

### A. ISSUES CONCERNING DEFENSE OF VOLUNTARY INTOXICATION
#### Mens Rea

¶ 23 The Information charged that,

"THE CRIME OF MURDER IN THE FIRST DEGREE WAS FELONIOUSLY COMMITTED IN OKLAHOMA COUNTY, OKLAHOMA, BY RICHARD STEPHEN FAIRCHILD 33 YEARS OF AGE WHO WILFULLY[1] AND UNLAWFULLY KILLED ADAM[ ] SCOTT BROOMHALL, A CHILD AGED 3 BY INJURING OR OTHERWISE USING UNREASON[ABLE] FORCE UPON ADAM SCOTT BROOMHALL INFLICTING MORTAL WOUNDS WHICH CAUSED HIS DEATH ON THE 14TH DAY OF NOVEMBER, 1993 . . . ."

¶ 24 Early in the trial the question arose whether intent to injure was an element of the crime charged. The prosecutor argued that "specific intent to injure" was not an element of the crime as charged. The trial court agreed and as a result denied Appellant's request for an instruction on voluntary intoxication. Voluntary intoxication is a defense only to specific intent crimes and not to general intent crimes. *See Kreijanovsky v. State*, 1985 OK CR 120, ¶ 9, 706 P.2d 541, 544.

¶ 25 First Degree Murder of a Child is statutorily defined in 21 O.S.1991, § 701.7(C), which was in effect as of November 1993:

"A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming [2] or using of unreasonable force by said person or who shall willfully cause, procure or permit any of said acts to be done upon the child pursuant to Section 843 of this title."

¶ 26 Title 21 O.S.1991, § 843 [3] stated as of November 1993:

"Any parent or other person who shall willfully or maliciously injure, torture, maim, use unreasonable force upon a child under the age of eighteen (18), or sexually abuse such child, as those terms are defined by Section 845 of this title or who shall cause, procure or permit any of said acts to be done, shall upon conviction be punished by imprisonment in the State Penitentiary . . . ."

¶ 27 In a 1991 Opinion in a First Degree Murder of a Child case that is dispositive of this issue, Judge Johnson said that the *mens rea* for § 701.7(C) was a "general intent" under the terms "willfully" or "maliciously":

"Appellant . . . complains that § 701.7(C) lacks any *mens rea*. We . . . must disagree. The intent for § 701.7(C) is found in 21 O.S. § 843 under the **general intent** of 'willfully' or 'maliciously'. *See Drew v. State*, 771 P.2d 224, 228, (Okl.Cr.1989). This assignment of error lacks merit." *Workman v. State*, 1991 OK CR 125, ¶ 22,

---

1. "Willful" and "willfully" are alternate spellings of "wilful" and "wilfully." Both spellings are used in the statutes and cases, and both are correct.

2. Neither "torturing" nor "maiming" was charged in the Information in this case. Since both terms necessarily include injuring *and* using of unreasonable force, the terms "torturing" or "maiming" would not be required in an Information filed under 21 O.S.1991, § 701.7(C) in which injuring *or* using of unreasonable force is alleged.

3. Later amended and incorporated in 10 O.S.Supp.1995, § 7115.

824 P.2d 378, 383 (Judges Brett and Parks dissented on other grounds) (emphasis added).

■ ¶ 28   Since § 701.7(C) is a "general intent" and not a "specific intent" crime, the defense of "lack of specific intent due to voluntary intoxication" is therefore inapplicable. *Workman* is a controlling case which was not brought to the attention of this Court in the briefs on appeal. *Workman* clearly states the law on this subject applicable to Appellant Fairchild as of November 1993 when Adam Broomhall was killed and at the time of Fairchild's trial and conviction.

¶ 29   *Workman* is consistent with a long line of criminal law cases in Oklahoma and other jurisdictions that have distinguished between "general intent" and "specific intent." In a syllabus by the Court in the 1953 case of *Vandiver v. State*,[4] we said:

> "Two general classes of 'intent' exist in the criminal law, a so-called 'general intent' which must exist in all crimes and a *further* mental element known as specific intent which is essential to particular crimes." (Emphasis added.)

¶ 30   Since 1910, Oklahoma statutes have provided that voluntary intoxication is no defense to a crime: "No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition." 21 O.S.1991, § 153.

¶ 31   However, since 1915, Oklahoma has made a limited exception by case-law to § 153 by providing that intoxication may constitute a partial defense to certain types of crimes. This limited defense was at first applied only to premeditated Murder, and could only reduce Murder to the lesser included offense of "First Degree Manslaughter," a "general intent" crime, if the defendant was so intoxicated that he could not form the premeditated design to kill. *Cheadle v. State*, 11 Okl.Cr. 566, 149 P. 919, 923. Later this limited defense was extended to other "specific intent" crimes.

¶ 32   The statutory definition of specific intent crimes usually include the words "intent to" (or "intention to") followed by a statement of a **further** intended action or consequence. See, for example, First Degree Malice Aforethought Murder,[5] Larceny,[6] Second Degree Burglary,[7] Assault with Intent to Commit a Felony — Kidnapping,[8] and Assault and Battery with a Dangerous Weapon.[9] An aberration to this rule is *Hockersmith v. State*, 1996 OK CR 51, ¶ 12, 926 P.2d 793, 795, in which this Court incorrectly held that Child Abuse, 21 O.S.1991, § 843, and therefore by implication First Degree Murder of a Child, 21 O.S.1991, § 701.7(C), which incorporates § 843 by reference, have a specific intent requirement. Neither § 843 nor § 701.7(C) contain the word "intent," nor do they contain a specific intent element or requirement that the defendant intend some **further** act or future consequence.

¶ 33   On the other hand, the statutory definition of crimes which we have held to be "general intent" crimes (or held *not* to be specific intent crimes) generally do not contain the word "intent" within their statutory definition. See, for example, Assault,[10] Ag-

---

4.  *Vandiver v. State,* 97 Okl.Cr. 217, 261 P.2d 617, 619 (1953), Reversed in part on other grounds by *Parker v. State,* 1996 OK CR 19, ¶ 23 & n. 4, 917 P.2d 980, 986 & n. 4, (*Parker* held the Information need not allege all elements of a crime with precision in order to confer jurisdiction on the court).

5.  *Patton v. State,* 1998 OK CR 66, ¶¶ 39, 46, 67, 973 P.2d 270, 286, 287, 292. "Malice *is* that deliberate *intention* unlawfully to take away the life of a human being...." 21 O.S.1991, § 701.7(A) (emphasis added).

6.  *Copperfield v. State,* 37 Okla.Crim. 11, 255 P. 590, 591 (1927) (stealing an automobile with *intent* to deprive the owner thereof and convert it to his own use and benefit) (emphasis added).

7.  *Ryans v. State,* 1966 OK CR 153, ¶¶ 14–16, 420 P.2d 556, 558–559 (with *intent* to steal therein) (emphasis added).

8.  *Vandiver,* 97 Okl.Cr. 217, 261 P.2d at 619, 624–25 (1953) (assault with *intent* to commit any felony) (kidnapping with *intent* to secretly confine) (emphasis added).

9.  *Quinn v. State,* 1971 OK CR 210, ¶¶ 1, 4–7, 485 P.2d 474, 476 (with *intent* to commit bodily harm) (emphasis added); 21 O.S.1991, §§ 641, 642 and 645.

10.  *Joplin v. State,* 1983 OK CR 63, ¶ 6, 663 P.2d 746, 747.

gravated Assault and Battery,[11] Arson,[12] Rape,[13] Manslaughter,[14] Manslaughter — Killing of Unborn Quick Child,[15] and First Degree Murder of a Child.[16]

¶ 34 By statutory definition, " '[W]ilfully' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or the omission referred to. It does not require any intent to violate law, or to injure another...." 21 O.S.1991, § 92. The terms "willfully" or "maliciously" preceding the words defining a proscribed act *normally* do not indicate a crime of "specific criminal intent." For example, the First Degree Arson statute, which we held in *Kreijanovsky* was not a specific intent crime, used both words: "Any person who *willfully and maliciously* sets fire to or burns...." *Kreijanovsky,* 1985 OK CR 120, ¶ 9, 706 P.2d at 544 (emphasis added); 21 O.S.1981, § 1401. We further held:

"[A]rson is not a specific intent crime, and voluntary intoxication is available as a defense only when the crime with which the defendant is charged has as its *mens rea* element a specific criminal intent or a special mental element. See 21 O.S.1981, § 1401 and *Boyd v. State,* 572 P.2d 276 (Okl.Cr.1977), respectively."

¶ 35 "Special mental element" obviously does not refer to terms like "willfully," "maliciously," or "knowingly," as the Arson statute contains the words "willfully and maliciously" and is "not a specific intent crime." *Kreijanovsky,* 1985 OK CR 120, ¶ 9, 706 P.2d at 544. Further, "willfully" is equivalent to "knowingly." *Tarver,* 1982 OK CR 156, ¶¶ 10–12, 651 P.2d at 1332–35.

¶ 36 "Special mental element," as used in *Kreijanovsky,* refers to such terms as "premeditated design" or "malice aforethought." "Malice" as used in "malice aforethought" is specially defined in 21 O.S.1991, § 701.7(A)

as follows: "Malice is that deliberate *intention* unlawfully to take away the life of a human being...." (Emphasis added.)

¶ 37 "Malice," given this special definition for the purpose of § 701.7(A) only, is not synonymous with, and should not be confused with, the ordinary definition of "malice" and "maliciously" used in such expressions as "malicious mischief." The general definition is found at 21 O.S.1991, § 95: "The terms 'malice' and 'maliciously,' when so employed, import a wish to vex, annoy or injure another person, established either by proof or presumption of law." This "wish" to vex, annoy, or injure is stated in the disjunctive. By its clear meaning, it could not *require* a wish to injure, but may import only a wish to vex, *or* only a wish to annoy, *or* only a wish to injure.

¶ 38 It is helpful to look at the meaning of "willful" as it has been defined in the general intent crimes of "Assault" and "Battery" in Oklahoma. Title 21 O.S.1991, § 641 states: "An assault is any willful and unlawful attempt or offer with force or violence to do a corporal hurt to another." Title 21 O.S.1991, § 642 defines battery: "A battery is any willful and unlawful use of force or violence upon the person of another." Crimes involving these statutes are "general intent crimes" except those that require some *further* specific intent, such as "intent to kill" or "intent to do bodily harm." Thus we held in *State v. Madden,* 1977 OK CR 155, ¶ 18, 562 P.2d 1177, 1180:

"[S]pecific intent is not an element of aggravated assault and battery. *See, Quinn v. State,* Okl.Cr., 485 P.2d 474 [1971]. "

¶ 39 The terms "willful ... injuring" of a child, resulting in the death of the child, or "willful ... using of unreasonable force" on a child, resulting in the death of the child, as used in 21 O.S.1991, § 701.7(C), are not redundant, but their meanings partly coincide or overlap.

---

11. *Quinn,* 1971 OK CR 210, ¶¶ 1, 4–7, 485 P.2d at 476; 21 O.S.1991, §§ 641, 642 and 646.

12. *Kreijanovsky v. State,* 1985 OK CR 120, ¶ 9, 706 P.2d 541, 544.

13. *Boyd v. State,* 1977 OK CR 322, ¶¶ 7–8, 572 P.2d 276, 278.

14. *Cheadle v. State,* 11 Okl.Cr. 566, 149 P. 919, 920, 922–24 (1915).

15. *Tarver v. State,* 1982 OK CR 156, ¶¶ 10–12, 651 P.2d 1332, 1334–35.

16. *Workman v. State,* 1991 OK CR 125, ¶ 22, 824 P.2d 378, 383.

¶ 40 "Injuring" is the broader class as it describes a result or consequence, does not specify or limit the type of action which causes the injury, and may or may not involve the use of force.[17] It is analogous to the use of the terms "willful killing" from the manslaughter statute in the *Tarver* case, where "killing" states a result or consequence which is prohibited, but does not describe or limit the means by which the "killing" might be accomplished. "Willful killing" did not mean "intent to kill," nor even *"intent to violate law, or to injure another,"* but meant that the accused "engaged in the conduct, inflicting injury upon the person of the mother, with the awareness that the death of the unborn quick child would likely result." *Tarver*, 1982 OK CR 156, ¶¶ 10–12, 651 P.2d at 1334–35.

¶ 41 "Using unreasonable force" on a child resulting in death is the more narrow class, as all actions prohibited under § 701.7(C) which result in the death of a child necessarily cause injury, but not all involve the use of force. "Using unreasonable force" is analogous to "battery." We said in *Holder v. State*, 1976 OK CR 288, ¶ 17, 556 P.2d 1049, 1052, that battery is defined by statute as "any wilful and unlawful use of force or violence upon the person of another." We further said (comparing 21 O.S.1971, § 642 with § 843):

> "Virtually, especially under the circumstances of the instant case, the proof necessary to sustain a conviction under one statute would likewise sustain a conviction under the other, with the exception of an additional element in Section 843. That element being the burden of the State to demonstrate, under Section 843, that the victim was under the age of seventeen."[18]

*Holder*, 1976 OK CR 288, ¶ 18, 556 P.2d at 1053.

¶ 42 "It is obvious that the legislature intended to create a special provision punishing more severely those persons who are guilty of battering children." *Id.*

¶ 43 Just as the "willful" use of force or violence inflicting "great bodily injury" upon a person (Aggravated Assault and Battery) does not require proof of a specific intent;[19] and just as the "willful killing" of an unborn quick child (Manslaughter in the First Degree) does not require proof of a specific intent;[20] and just as "willfully and maliciously" setting fire to or burning an inhabited building (Arson First Degree) does not require proof of a specific intent;[21] neither does the "willful" injuring of a child resulting in death, nor the "willful" using of unreasonable force upon a child resulting in death (First Degree Murder of a Child), require proof of a specific intent.[22] All of these crimes contain the words "wilful," "willful," or "willfully," and none are specific intent crimes.

¶ 44 Appellant in his Petition for Rehearing incorrectly states: "The settled law in Oklahoma is that child abuse murder has a specific intent element." He cites five cases in support of his assertion: *Grady v. State*, 1997 OK CR 67, ¶ 3, 947 P.2d 1069; *Bannister v. State*, 1996 OK CR 60, ¶ 3, 930 P.2d 1176, 1178; *Hockersmith v. State*, 1996 OK CR 51, ¶ 12, 926 P.2d 793, 795; *Revilla v. State*, 1994 OK CR 24, 877 P.2d 1143, 1148, 1152; and *Watkins v. State*, 1987 OK CR 215, 744 P.2d 967, 970.

¶ 45 Actually, only one of the cited cases, *Hockersmith*, used the term "specific intent" in the majority opinion. This was at only one point in the next to last sentence before

---

17. Examples of acts which result in injury or death but do not require force may include such acts as willfully drowning, burning, freezing, starving, asphyxiating, or poisoning a child, or willfully placing a child in or enticing a child into a dangerous place, such as in the path of a moving vehicle.

18. Later amended to the age of eighteen.

19. *State v. Madden*, 1977 OK CR 155, ¶ 18, 562 P.2d 1177, 1180; 21 O.S.1991, §§ 641, 642 and 646.

20. *Tarver*, 1982 OK CR 156, ¶¶ 10–12, 651 P.2d at 1334–35; 21 O.S.1991, § 713.

21. *Kreijanovsky*, 1985 OK CR 120, ¶ 9, 706 P.2d at 544; 21 O.S.1991, § 1401.

22. *Workman*, 1991 OK CR 125, ¶ 22, 824 P.2d at 383; 21 O.S.1991, § 701.7(C).

the decision in the case. *Hockersmith*, 1996 OK CR 51, ¶ 12, 926 P.2d at 795. In this regard, *Hockersmith* was in error, and we overrule *Hockersmith* to the extent that the word "specific" is used in the next to the last sentence before the decision of the majority opinion, as contrary to *Workman* and well-established law in this State.[23]

¶ 46 This does not mean that we have changed the law that was in force at the time of Appellant Fairchild's crime or trial. *Hockersmith* was not decided until August 9, 1996, subsequent to the murder of Adam Broomhall and subsequent to Fairchild's trial and conviction, and therefore could not have applied to his case and could not have been relied upon by him.

¶ 47 While it is true that these cases cited by Fairchild do contain the words "intent to injure," none of them suggest language for an additional jury instruction on "intent to injure" because the intent referred to is only the intent encompassed within the term "willful." The crime can be committed either by willfully injuring or willfully using unreasonable force against the child. Therefore, the minimum requirement is that the State prove that a defendant willfully used unreasonable force upon a minor child which caused an injury which resulted in the death of that child, or that a defendant willfully committed any act which caused injury to a minor child which resulted in the death of that child. This does not make this crime a specific intent crime and does not entitle the defendant to an intoxication defense instruction.

¶ 48 Appellant has cited no case which suggests that the intoxication defense is available to a person charged with this type of murder, or with child abuse, or injuring a minor child. We held in *Morse v. State*, 1968 OK CR 51, ¶ 4, 438 P.2d 309, 310, construing 21 O.S.Supp.1968, § 843: "Intoxication is no defense . . . for a grown man to mistreat and beat a small child to the degree of severity that hospitalization is required." There has been no change in language in subsequent versions of § 843 or in equivalent language of 21 O.S.1991, § 701.7(C) that would require a different result.

¶ 49 This Court stated in *Revilla*, "[T]he State was not required to prove the element of intent to kill, but was required to prove that Appellant 'willfully' or 'maliciously' injured, tortured, maimed or used unreasonable force upon the victim." *Revilla*, 1994 OK CR 24, ¶ 11, 877 P.2d at 1148. *Revilla* did not require the State to prove "intent to injure," but stated that other-crimes evidence was properly admitted to show Revilla's "intent to injure" the decedent and to refute his claim of accident. *Id.* 1994 OK CR 24, ¶ 28, 877 P.2d at 1152. It was permitted to show an intent to injure, but not required. It is proper to introduce evidence to refute the claim of accident because the burden on the prosecution is to show that the acts were committed willfully or maliciously, and not "accidentally or involuntarily." *Tarver*, 1982 OK CR 156, ¶ 11, 651 P.2d at 1334–35.

¶ 50 In the *Watkins* case, the defendant shot and killed Charles Wright, who was holding Watkins' child in his lap. *Watkins*, 1987 OK CR 215, ¶ 14, 744 P.2d at 968. Watkins had rammed a shotgun through a window and held it up to Wright's head when it was fired. The child received only minor incidental cuts from the flying glass fragments. We held that all the willful and malicious intent was directed towards Charles Wright, not towards the child. Therefore, defendant's conviction for the murder of Wright was upheld, but his conviction for Injury to a Minor Child was reversed. We held the evidence did not prove that Watkins "willfully or maliciously" injured his daughter. The intent to injure referred to was only the general intent included in "willfully or maliciously." *Id.* There was no holding that this was a specific intent crime.

¶ 51 We clarify our previous opinions in *Watkins, Revilla, Hockersmith, Bannister,* and *Grady* to specify that the "intent to injure" mentioned in those cases means only that general intent included within the terms "willfully" or "maliciously." Thus the use of the term "willful" with "injure" in 21 O.S. 1991, § 701.7(C) does not *require* a specific

---

**23.** *Workman*, 1991 OK CR 125, ¶ 22, 824 P.2d at 383; *Vandiver*, 97 Okl.Cr. at 217, 261 P.2d at 619 (1953). Also see cases and statutes cited in footnotes 4–16 and 19–22 herein.

intent to injure, but only a general intent, included in the term willfully, to commit the act which causes the injury.

¶ 52  In Appellant's Petition for Rehearing, he correctly points out that a definition in former Instruction No. 736 OUJI–CR (now No. 8–39 OUJI–CR (2d)) implies that voluntary intoxication is also a defense to crimes with the special state of mind known as "willfully." The definition of "Incapable of Forming Special Mental Element" contained in Instruction No. 8–39 OUJI–CR (2d), "The state in which one's mental powers have been overcome through intoxication, rendering it impossible to form the special state of mind known as corruptly/ knowingly/ willfully/ maliciously," cites no Oklahoma authority, does not correctly express Oklahoma law, and should not be used in future trials. *See Kreijanovsky*, 1985 OK CR 120, ¶ 9, 706 P.2d at 544; and *Tarver*, 1982 OK CR 156, ¶¶ 10–12, 651 P.2d at 1334–35. This incorrect instruction was neither requested nor given in Fairchild's trial, and therefore no error occurred.

¶ 53  Fairchild complains in his Petition for Rehearing that a new interpretation of Oklahoma law has been applied to him *ex post facto*. However, the law relating to intoxication as a defense was clearly established at the time of his crime and trial, and our holdings herein are consistent with that well-established law. No new law has been created or applied to him *ex post facto*.

¶ 54  Fairchild also complains in his Petition for Rehearing that our original Opinion herein created two alternate theories of prosecution, one which required proof of an intent to injure, and one which did not, and both of which were charged in this case. He theorizes that would bring his case into conflict with *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), which held that when a case is submitted to the jury on alternate theories and one of those theories is constitutionally infirm, the conviction must be reversed.

¶ 55  We did hold in our original Opinion herein (since withdrawn) that murder by willfully using unreasonable force on a child required no intent to injure, while murder by willfully injuring a child did require an intent to injure. We have corrected that misstatement of law by our ruling herein. Since the proof necessary to establish murder either by "willfully injuring a child" or by "willfully using unreasonable force on a child" would be identical under the facts of this case, it does not matter which phrase was adopted by individual members of the jury. Since neither alternative is constitutionally infirm, since both were properly instructed upon, since the burden of proof is identical, and since the resulting crime, the unavailability of the intoxication defense, and the permitted penalties are the same, there is no violation of *Stromberg*. This is analogous to situations where malice aforethought murder and felony murder are pled in the alternative, and there is evidence to support both theories. We have held that the failure of a jury to indicate the basis of the finding of guilt in such cases was not error. *Newsted v. State*, 1986 OK CR 82, ¶¶ 5–6, 720 P.2d 734, 737; *James v. State*, 1981 OK CR 145, ¶¶ 14–20, 637 P.2d 862, 865.

## B.  EVIDENTIARY ISSUES

¶ 56  In Propositions III, IV, and V the Appellant raises first-stage evidentiary issues. His argument in Proposition III is that the evidence was insufficient to support a conviction because the evidence of his intoxication at the time the crime was committed precludes proof of intent to injure or use unreasonable force on a child. The question of the defendant's intoxication and its effect on his ability to form a specific intent was withheld from the jury by the trial judge who believed First Degree Murder of a Child under § 701.7(C) is a crime requiring only general criminal intent. We hold that Judge Wilson was correct. Voluntary intoxication is a partial defense only to specific intent crimes. *Kreijanovsky*, 1985 OK CR 120, ¶ 9, 706 P.2d at 544.

¶ 57  As First Degree Murder of a Child under 21 O.S.1991, § 701.7(C) is a general intent crime, voluntary intoxication is no defense. The evidence of voluntary intoxication is not relevant to the question of guilt in this case, and the giving of Fairchild's requested

instruction on voluntary intoxication would have been improper.

¶ 58 The second evidentiary argument (Proposition IV) concerns admission of testimony by the State's first-stage witness, Dr. Stuemky, a physician who did not treat the victim, but who testified as an expert witness from the medical record. Appellant argues three portions of Dr. Stuemky's testimony were inadmissible: 1) his conclusion the victim's injuries were caused by child abuse; 2) his cumulative recitation of the victim's injuries, and 3) his statements regarding the fact these injuries had caused pain.

¶ 59 Over strenuous defense objection, the prosecutor asked Dr. Stuemky if child abuse were a medical diagnosis, and what his medical diagnosis was concerning Adam Broomhall. When the defense argued the response would go to the ultimate issue of guilt, the prosecutor countered with the argument that the legal definition[24] and medical diagnosis of child abuse "may be very different." The trial court overruled the objection and Dr. Stuemky testified: "The medical diagnosis of this child would be head injuries secondary to child abuse." Dr. Stuemky stated no opinion about the guilt or innocence of the Defendant.

¶ 60 The particular phrase "child abuse" has no legal significance in this case. The words "child abuse" did not appear in the text of the murder statute, 21 O.S.1991, § 701.7(C), in 1993, nor in 21 O.S.1991, § 843 (except in the publisher's heading which is not a part of the statute). Nor were the words "child abuse" used in the charging information in this case, nor in the court's instructions to the jury. "Child abuse" is a shorthand phrase used by attorneys, but does not signify an ultimate issue which

would have special significance for jurors.[25] In *Revilla v. State*, 1994 OK CR 24, ¶ 21, 877 P.2d 1143, 1150, an expert, Dr. Balding, testified that in a particular study maybe ninety-five percent of cases, where the death of a child resulted from severe head injury, represented "some form of child abuse." We found "that the testimony was an opinion on the cause of decedent's injuries, not on appellant's guilt." Likewise, Dr. Stuemky's testimony including the words "secondary to child abuse" was proper.

¶ 61 Dr. Stuemky was entitled to state his opinion as an expert, and he made no statement about his personal opinion of Fairchild's guilt. His "specialized knowledge [did] assist the trier of fact to understand the evidence [and] to determine a fact in issue." 12 O.S.1991, § 2702. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." 12 O.S.1991, § 2704.

¶ 62 Since laymen generally do not have the expertise to personally evaluate the degree of force needed to cause internal trauma by blunt force injury to the human skull, it is necessary that we have experts to demonstrate, verbally or graphically, what occurs. The testimony of Dr. Stuemky that the head injury was "secondary to child abuse" meant only that the extent of injury to the child's head was not consistent with any reasonable theory of accident, but was caused by the acts of some person other than Adam.

¶ 63 The most important question the jury had to answer in this case was which of Fairchild's versions of events were true. In his handwritten statement given to Sgt. Smith at 2:10 a.m., only thirty-five minutes after Adam became unconscious, he said,

24. See footnote 25 below.

25. The term "child abuse" was never included in § 843, but was added when § 843 was renumbered as 10 O.S.Supp.1995, § 7115 effective November 1, 1995 within the "Oklahoma Child Abuse Reporting and Prevention Act." The term "Abuse," standing alone, was not defined by the legislature for purposes of that Act until 1998 when 10 O.S.Supp.1998, § 7102 was amended to say, " 'Abuse' means harm or threatened harm to a child's health or safety by a person responsible for the child's health or safety...." *Id.* The

definition of "[p]erson responsible for a child's health or safety" includes, in addition to parents, among others, "any ... adult living in the home of the child." *Id.* Since murderers of a child who are **not** persons "responsible for a child's health or safety" can still be charged under 21 O.S.Supp.1998, § 701.7(C) but could not be guilty of child "abuse," we have used the term "First Degree Murder of a Child" in this Opinion instead of the more traditional term "Child Abuse Murder" to refer to a violation of § 701.7(C).

"I was sitting down watching TV at 1:35 and my son Adam was running in the house, he ran right into the table and I ask him if he was alright. I could not get him to answer so I started shaking him, but he was not coming to...."

Two days later he told Detective Burton in a video taped interview (Exhibit # 15):

"He wouldn't shut up. I told him to go to sleep. I went back to sleep. I heard a loud noise. I woke up and there was Adam laying down. I tried to get him up. I got scared."

Then he told Detective Burton, later in the same interview:

Fairchild: "The more he screamed, the more I just kept on hitting him."

. . . .

Fairchild: "And I think I smacked him again."

Burton: "Was that in the living room?"

Fairchild: "Yes sir."

Burton: "That's when he wouldn't wake up, right?"

Fairchild: "Yes sir. He wouldn't move, so I went in there to bed with Stacy and told her I can't get Adam to move. I was pretty intoxicated — too much. I just couldn't control my temper, I guess."

¶ 64 Thus it was important for the jury to determine whether Adam's death could have been accidental. As we noted in the case of *Schultz v. State,* 1988 OK CR 17, ¶ 8, 749 P.2d 559, 562, where the facts closely paralleled those of the Fairchild case:

"The State necessarily relied upon circumstantial evidence that the child was abused. The four physicians who testified all agreed that the extent of Lindsay's injuries led them to conclude that she was abused, and that those injuries were recent. The medical examiner testified that the child's death was caused by a severe trauma to the head which resulted in a subdural hematoma, and led to acute bronchopneumonia. The physicians agreed that the accident described by the appellant could not have resulted in the extent of her injuries. The appellant admitted that Lindsay was in his sole care during

the time she received the injury which caused her to lose consciousness."

¶ 65 Fairchild argues in Proposition IV–C that Dr. Stuemky's testimony was inadmissible, for it was cumulative in some respects to the testimony of the treating physicians and the paramedics who responded to the 911 call. We find, however, the allegedly cumulative testimony was admitted as foundation regarding the amount of force required to cause these injuries, and the testimony regarding force was not cumulative. Therefore, we find no error in the admission of this testimony.

¶ 66 At trial the defense objected to testimony by Dr. Stuemky regarding the pain Adam would have experienced as a result of his injuries, arguing pain was not a first-stage issue. Appellant now urges this argument on appeal (Proposition IV–D). We disagree. Pain, and the deceased's reaction to it, would be relevant to the jury's determination as to whether the defendant used unreasonable force against this child. This was part of the *res gestae.* Evidence of the pain suffered by a murder victim and caused by the accused is admissible. Appellant cites no case that says pain is not admissible in the first stage of a murder trial. We find no error in the admission of this relevant evidence. 12 O.S.1991, § 2402.

¶ 67 Appellant objected at trial and on appeal (Proposition V) to the introduction of State's Exhibit # 83, a color autopsy photograph taken of the inside of Adam's skullcap lying on a blue cloth background. One half of the inside of the skull is near white, while almost the entirety of the other half is covered by clotted blood. The exhibit was admitted over defense objection during the medical examiner's testimony. Appellant argues the admission of this photograph warrants reversal. Post-autopsy photographs are found to be inadmissible when their probative value is substantially outweighed by their prejudicial effect. 12 O.S.1991, § 2403; *Sattayarak v. State,* 1994 OK CR 64, ¶ 8, 887 P.2d 1326, 1330; *Oxendine v. State,* 1958 OK CR 104, ¶¶ 6–8, 335 P.2d 940, 943.

¶ 68 The instant case can be easily distinguished from the *Sattayarak* and *Oxendine*

cases. In each of those cases, the post-autopsy photographs showed the irrelevant crudely stitched Y-incision on the exterior of the body in addition to the relevant wound caused by the murderer.

¶ 69 *Ritchie v. State*, 1981 OK CR 91, ¶¶ 4–7, 632 P.2d 1244, 1245, is closer to the facts of the instant case. In that case, separate photographs of the three-year-old child victim's bare skull with the scalp peeled back, his brain, and the inside of his skull were shown to the jury. The case was reversed for a new trial. In Fairchild's case, only a single picture of the inside of the surgically removed skullcap, not the brain or scalp, was shown to the jury. Defendant *Ritchie* had admitted that she had struck the deceased and that her boyfriend (codefendant) had severely "punished" the deceased throughout the preceding evening. There was no claim of accident. Thus, there was no doubt that the injury was caused by the actions of the defendants.

¶ 70 In Fairchild's case, however, we have no living eyewitness except Fairchild himself to tell us what happened, and he has told several conflicting stories. *Robison v. State*, 1984 OK CR 21, ¶ 31, 677 P.2d 1080, 1087, held that the "[p]robative value of photographs of murder victim can be manifested in numerous ways, including showing nature, extent, and location of wounds ... and corroborating medical examiner's testimony." The photograph of Adam's skull was relevant to the cause of death and to show the extreme extent of hemorrhaging, and it was the only medical examiner's photograph shown to the jury in the first stage of the trial. The other medical examiner photographs were withheld until the second stage where they were particularly relevant to the aggravator of "especially heinous, atrocious, or cruel." *See Ellis v. State*, 1992 OK CR 45, 867 P.2d 1289, 1299.

¶ 71 We find that the sterile, clinical photograph of the victim's skull was properly admitted. We do not find Exhibit # 83 improperly incited the passions of the jury. Under the specific circumstances of this case, the *Ritchie* case can be distinguished, and it was not an abuse of discretion to admit the photograph of Adam's surgically removed skullcap into evidence to corroborate the testimony of the medical experts.

## C. JURY INSTRUCTIONS

¶ 72 Proposition I challenges the instruction given by the trial court on the meaning of "willful" in the context of "willful use of unreasonable force." The instruction defines "Willful" as follows: "Purposeful. 'Wilful does not require any intent to violate the law, or to injure another...." Appellant did not object to this instruction at trial. Therefore, we examine for plain error only. This instruction was found to be confusing and to require reversal in *Hockersmith v. State*, 1996 OK CR 51, ¶ 10, 926 P.2d 793, 795.

¶ 73 The same phrase used in *Bannister v. State*, 1996 OK CR 60, ¶ 3, 930 P.2d 1176, 1178, in combination with other errors, was also held to require reversal. The same phrase, however, in the absence of other significant error, in *Grady v. State*, 1997 OK CR 67, ¶ 3, 947 P.2d 1069 (First Degree Murder of a Child), and *Lewis v. State*, 1998 OK CR 24, ¶ 28, 970 P.2d 1158, 1169 (Child Abuse), was held to be harmless error.

¶ 74 Inasmuch as we hold today "intent to injure" is not a required separate element of First Degree Murder of a Child (the *mens rea* is included within the terms "willful injuring" or "willful use of unreasonable force"), we conclude that this instruction correctly stated the law in effect at the time of Appellant's trial and the law in effect today. Any language in *Watkins, Revilla, Hockersmith, Bannister,* and *Grady* inconsistent with our holding herein is expressly overruled.

¶ 75 However, the phrase "or to injure another" that was held to be confusing in *Hockersmith*, although derived straight from the statutory definition, was not necessary to define "willfully," but was only one of three examples of what "willfully" did not mean. That phrase has now been removed from the definition in Instruction No. 4–39 OUJI–CR (2d) (Supp.1997) to avoid any possible misunderstanding on the part of the jury. The new instruction correctly states the basic definition and should continue to be used.

¶ 76 Appellant also argues in Proposition II the trial court committed reversible error by denying his requested instruction on second-degree murder due to voluntary intoxication. Voluntary intoxication may be a valid defense to those crimes that include an element of specific intent. As First Degree Murder of a Child (§ 701.7(C)) by means of the willful use of unreasonable force or by willful injuring does not include an element of specific intent, voluntary intoxication is not a defense to it. The trial court correctly refused to give instructions on lesser included offenses as none were called for by the evidence. *Shrum v. State*, 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 70 OBJ 3268, 3269.

¶ 77 Appellant also argues under his Proposition II the trial court should have instructed the jury *sua sponte* on manslaughter in the first degree when perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner. *See* 21 O.S.1991, § 711(2). We held in the *Holder* case, 1976 OK CR 288, ¶ 18, 556 P.2d at 1053:

"It is obvious that the legislature intended to create a special provision punishing more severely those persons who are guilty of battering children. Section 843 is a specific provision ... whereas Section 642 is a more general provision.... And, the common law rules of construction dictate that the more specific of the two applicable provisions be utilized in a given situation.... In a case such as the one before us the objective of the legislature, in creating a special battery provision, would be thwarted if offenders were convicted under the more general provision when their conduct and the age of their victim fell within the provisions of the more specific statute. There being no question as to the age of the child being less than seventeen years[26] the trial court was correct in refusing to instruct the jury under Section 642."

Likewise, where the violation of § 843 results in the death of the child, the more specific homicide provision, § 701.7(C), should be used. Only if there is evidence which tends to negate an element of the First Degree Murder statute, which would reduce the charge, should instructions on a lesser included offense be given.

¶ 78 There was no evidence that the victim was not a child. Nor was any other defense presented which would have justified the giving of a manslaughter instruction. Trial counsel acted properly in not requesting one, and the trial court acted properly in not giving a manslaughter instruction *sua sponte*. *Hooker v. State*, 1994 OK CR 75, ¶¶ 31–33, 887 P.2d 1351, 1360–61; *Ellis v. State*, 1992 OK CR 45, ¶¶ 15–16, 867 P.2d 1289, 1297–98; *Duvall v. State*, 1991 OK CR 64, ¶¶ 9–10, 825 P.2d 621, 627; *Fowler v. State*, 1989 OK CR 52, ¶¶ 28–29, 779 P.2d 580, 585.

## SECOND–STAGE ISSUES

### A. EVIDENCE

¶ 79 The State introduced eighteen post-mortem photographs in the punishment stage of trial documenting the injuries suffered by the child victim. Appellant argues in Proposition V these are cumulative and unduly prejudicial.

¶ 80 Needlessly cumulative evidence may be excluded by the trial court, and there is a point at which needless repetition can inflame the jury and result in error. *Livingston v. State*, 1995 OK CR 68, ¶¶ 20–21, 907 P.2d 1088, 1094; 12 O.S.1991, § 2403. These eighteen photographs were withheld and not offered or admitted until the second stage of the trial when they were particularly relevant to the allegation of the "especially heinous, atrocious, and cruel" aggravating circumstance. *Ellis*, 1992 OK CR 45, ¶¶ 24–25, 867 P.2d 1289. In *Willingham v. State*, 1997 OK CR 62, ¶ 41, 947 P.2d 1074, 1083 (*overruled in part on other grounds by Shrum v. State*, 1999 OK CR 41, ¶ 10 n. 8, 991 P.2d 1032, 70 OBJ 3268, 3271 n. 8) we said:

"Photographs admitted during second stage were relevant to show the extent of the injuries and allow the jury to decide whether the injuries caused physical suffering or amounted to torture. There was no error in admitting the photographs of

---

26. Age "seventeen" years in 21 O.S. § 843 was later amended to "eighteen" years.

the victim in this case in either the first or second stage of trial."

*Willingham* held that the photographs corroborated the medical examiner's testimony and "showed the wide ranging locations of the victim's wounds." *Willingham,* 1997 OK CR 62, ¶ 38, 947 P.2d at 1083. In Fairchild's case, many pictures were necessary to show the large number of injuries inflicted on different parts of Adam's head and body. It was estimated that there were 26 separate contusions on Adam's head and body. We hold that the admission of these photographs was not error.

¶ 81 In Proposition IX the Appellant challenges the use of the same evidence to prove guilt and the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." He argues such use is a form of double jeopardy barred by the state and federal constitutions, as well as double prosecution barred by 21 O.S.1991, § 11(A).

¶ 82 Double jeopardy concerns are not triggered by the use of the same evidence to prove guilt and impose punishment, for the finding of guilt is merely a necessary condition for imposing a single punishment. *See Lowenfield v. Phelps,* 484 U.S. 231, 241, 108 S.Ct. 546, 553, 98 L.Ed.2d 568, 583 (1988). Likewise, Section 11(A) is not implicated either.

¶ 83 Appellant argues in Proposition XI the evidence is insufficient to prove the murder was "especially heinous, atrocious or cruel" because "the injuries inflicted upon the child worked together to contribute to his death." In order to support a finding that a murder is especially heinous, atrocious, or cruel, the evidence must be sufficient to show the murder was preceded by torture or serious physical abuse. *Stouffer v. State,* 1987 OK CR 166, ¶ 6, 742 P.2d 562, 563; *Hawkins v. State,* 1994 OK CR 83, ¶ 42, 891 P.2d 586, 596. Uncontroverted evidence established Fairchild ruptured Adam's upper lip by hitting him in the mouth, hit his left ear with sufficient force to rupture the eardrum, caused approximately 26 separate contusions on Adam's head and body, burned him by holding him up to a hot wall heater, producing second-degree burns on his chest and bottom, and finally inflicted the fatal blow by throwing him a distance of several feet against the drop-leaf table. Fairchild said in his video-taped statement, "The more he screamed, the more I just kept on hitting him." This was corroborated by photographs showing multiple recent bruises on Adam's body and by the autopsy finding of four or five severe sub-galeal (beneath the scalp) contusions and hemorrhages, in addition to the extensive sub-dural (inside the skull) hemorrhages and swelling of the brain which caused the death. Uncontroverted evidence also established the victim was in pain during the hitting and burning, for according to Fairchild's own admissions the child was screaming until he was thrown against the table. There was testimony that second-degree burns are the most painful type of burns. (Presumably because third-degree burns would have destroyed the nerve endings.) Since Adam was screaming, we know he was conscious until the fatal blow. Evidence of this gratuitous violence provided sufficient evidence to prove beyond a reasonable doubt the murder in this case was preceded by torture and serious physical abuse.

**B. JURY INSTRUCTION**

¶ 84 Appellant's Proposition X complains of erroneous punctuation in second-stage jury Instruction Number 4. When the trial court instructed the jury on its duty to determine whether the "especially heinous, atrocious or cruel" aggravating circumstance existed, it gave the following erroneous instruction:

"You are instructed that, in arriving at your determination of punishment, you must first determine whether at the time this crime was committed. The following aggravating circumstance existed beyond a reasonable doubt:

"1. The murder was especially heinous, atrocious or cruel."

The first sentence is flawed grammatically as a period was inserted in the sentence after the word "committed," and this was followed by a capitol "T" in "The," indicating a new sentence. The Appellant argues the punctuation error caused the trial court to advise

the jury that the aggravating circumstance in fact existed beyond a reasonable doubt, rather than directing the jury to decide the question. No contemporaneous objection was lodged, so we examine this question for plain error. *Perry v. State*, 1995 OK CR 20, ¶ 42, 893 P.2d 521, 531. We note that when read aloud, the break in the sentence is not easily detected.

¶ 85 When we read the instructions as a whole, we find Instructions Numbered 6, 10, and 11 all instructed the jury it must decide whether the aggravating circumstance existed beyond a reasonable doubt, and that its decision must be unanimous. Because the instructions as a whole properly instruct the jury, we find there is no plain error.

¶ 86 In the Fourteenth Proposition the Appellant raises five challenges to the second-stage jury instructions. First (XIV–A), he argues the trial court did not inform the jury the finding of mitigating circumstances did not have to be unanimous. Appellant acknowledges this issue has been decided against him in *Harjo v. State*, 1994 OK CR 47, ¶ 76, 882 P.2d 1067, 1081. We find no reason to revisit the issue.

¶ 87 The second challenge (XIV–B) addresses the instructions on the use of mitigating evidence. The standard instruction on mitigating evidence directed the jury that mitigating circumstances are those which "in fairness and mercy, may be considered extenuating or reducing the degree of moral culpability or blame." This instruction is a correct statement of law. *Mayes v. State*, 1994 OK CR 44, ¶ 148, 887 P.2d 1288, 1319–1320. There is no error here.

¶ 88 The defense requested an instruction directing the jury that it could decline to impose the death penalty even if it unanimously found an aggravating circumstance. The Appellant argues (XIV–C) that the trial court erred by failing to so instruct the jury. We have rejected this argument and find no reason to revisit it. *Valdez v. State*, 1995 OK CR 18, ¶¶ 78–80, 900 P.2d 363, 385; *Bryson v. State*, 1994 OK CR 32, ¶ 61, 876 P.2d 240, 262–263.

¶ 89 Appellant next argues (XIV–D) the trial court misinstructed the jury on the pro-

cess of weighing the aggravating and mitigating evidence. The balancing test set forth by the instructions is a correct statement of law. *Scott v. State*, 1995 OK CR 14, ¶ 43, 891 P.2d 1283, 1297.

¶ 90 The defense requested, and the trial court declined, an instruction on the meaning of a life sentence and the meaning of a sentence of life without possibility of parole. During deliberations, the jury sent out a note asking whether the defendant would ever be released from prison if he were sentenced to life without the possibility of parole. The trial court responded by telling the jury it had all the evidence it needed to decide the case. Appellant claims error. (XIV–E) We find that the trial court ruled properly in its denial of the requested instructions and in its response to the jury question, for the court has no duty to explain the Oklahoma parole process to the jury. We have previously decided this same issue. *Johnson v. State*, 1996 OK CR 36, ¶¶ 51–52, 928 P.2d 309, 320; *McGregor v. State*, 1994 OK CR 71, ¶ 36, 885 P.2d 1366, 1383; *Mayes*, 1994 OK CR 44, ¶ 148, 887 P.2d at 1319–20.

¶ 91 In Proposition XII, the Appellant argues the "especially heinous, atrocious or cruel" aggravating circumstance is unconstitutionally vague. This argument has been rejected consistently by this Court, and we find no reason to revisit it here. *Le v. State*, 1997 OK CR 55, ¶¶ 41–45, 947 P.2d 535, 552–53; *Smith v. State*, 1996 OK CR 50, ¶ 46, 932 P.2d 521, 536.

¶ 92 In Proposition XVII, the Appellant argues the death sentence was influenced by passion and prejudice. We do not find any prejudice or undue passion created by the issues raised by the Appellant.

## TRANSCRIPT ERRORS

¶ 93 The transcript in this case contains numerous errors, and several bench conferences are not transcribed. Appellant argues in Proposition VI that this deprives him of the right to a meaningful appeal because he cannot present his claims fully. The Appellant presents nothing beyond mere rank speculation to support this argument

factually. Absent some showing of harm, we find no relief is warranted. *Parker v. State,* 1994 OK CR 56, ¶¶ 23–27, 887 P.2d 290, 294–295; *Woodruff v. State,* 1993 OK CR 7, ¶ 13, 846 P.2d 1124, 1132.

## REPORT BY THE TRIAL JUDGE

■ ¶ 94 Judge Major Wilson died shortly after trial and did not file a trial report in this case. The trial report is mandated by statute as well as court rule. 21 O.S.1991, § 701.13; Rule 9.2(D), *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S.Supp.1996, Ch.18, App. Upon notice from the District Court Clerk that the report had not been filed, this Court ordered an evidentiary hearing be held to determine whether the report, or notes to support the report had been prepared by the then deceased judge. District Judge Dan Owens filed an order concluding no trial notes existed and no report had been prepared. Appellant argues in Proposition VII that the missing report denies him meaningful appellate review.

¶ 95 In support of this argument, the Appellant cites two instances in which this Court used information from the trial report to modify a sentence. The Appellant points us to nothing in the record to support the argument the trial report might have contained statements helpful to him. Where the trial report cannot be filed, and the Appellant can show nothing beyond pure speculation to suggest it might have been helpful to him, we find no relief is warranted.

## CONSTITUTIONALITY OF THE CHILD MURDER STATUTE

■ ¶ 96 In Proposition XV the Appellant argues the statute defining First Degree Murder of a Child, 21 O.S.1991, § 701(C), is unconstitutionally vague. He asks the Court to reconsider its holding in *Drew v. State,* 1989 OK CR 1, ¶ 12, 771 P.2d 224, 228, in which the term "unreasonable force" in 21 O.S.Supp.1982, § 701(C) was found not to be unconstitutionally vague. We find no reason to disturb this ruling. As we held in *Drew,* the language of the statute is "sufficiently clear and explicit that all persons of ordinary intelligence could understand its provisions." *Id.*

¶ 97 In Proposition XIII, the Appellant argues the authorization of the death penalty for murder of a child which requires only an intent to injure, but not an intent to kill [restated: willfully committing an act which causes injury to a child resulting in death or willfully using unreasonable force upon a child resulting in death], violates the Eighth and Fourteenth Amendments of the Federal Constitution and Article 2, §§ 7, 9, and 19 of the Oklahoma Constitution. Appellant grounds his federal constitutional argument on *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 149–150, 107 S.Ct. 1676, 1684, 95 L.Ed.2d 127 (1987).

¶ 98 The Appellant argues *Tison,* 481 U.S. at 157, 107 S.Ct. at 1688, 95 L.Ed.2d at 145, establishes the least culpable mental state sufficient for death eligibility as "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death." *Tison* is a felony-murder case in which the defendant himself did not kill. This Court has found *Tison* does not apply to a defendant who, by his own hand, does kill. *Wisdom v. State,* 1996 OK CR 22, ¶¶ 38–40, 918 P.2d 384, 395.

¶ 99 This holding is consistent with the Supreme Court's holding in *Enmund* that the Eighth Amendment "requires that he himself [a death-sentenced defendant] have actually killed, attempted to kill, or intended that lethal force be used." *Cabana v. Bullock,* 474 U.S. 376, 390, 106 S.Ct. 689, 699, 88 L.Ed.2d 704, 719 (1986). "The Eighth Amendment is satisfied so long as the death penalty is not imposed upon a person ineligible under *Enmund* for such punishment." *Id.* at 386, 106 S.Ct. at 697, 88 L.Ed.2d at 716. "If a person sentenced to death in fact killed, attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her execution." *Id.* The Oklahoma Constitution does not impose a higher standard than the Federal Constitution regarding the holdings of *Enmund, Cabana v. Bullock,* or *Tison.*

¶ 100 We hold a defendant convicted of First Degree Murder of a Child by willful injury or by the willful use of unreasonable force may be death eligible. Where a defendant personally,[27] willfully commits an act which produces an injury upon a child resulting in the death of the child, or uses unreasonable force upon a child resulting in the death of the child; and if additionally one or more of the statutory aggravating circumstances is proven which outweighs the mitigating circumstances, if any; then that defendant may be sentenced to death.[28]

**27.** This is not to say that a vicarious murderer would not be death eligible under a similar fact situation, but that question is not presented by the facts of this case. See discussion of *McCracken v. State* in footnote 28 herein.

**28.** The dissenting opinions equate First Degree Murder of a Child with "felony murder." Despite similarities, however, there are significant differences. Unlike murders under the felony-murder rule, First Degree Murder of a Child requires proof of a willful or malicious action by the perpetrator or perpetrators resulting in the death of a child, either by use of unreasonable force upon the child or by any act which results in injury to the child. In First Degree Murder of a Child, the willful acts of the perpetrator cause the death. This requires an intentional act rather than an accidental or inadvertent act, but requires no specific intent to kill or injure.

Like first degree malice and first degree felony murder, First Degree Murder of a Child may be punished by death only if one or more statutory aggravating circumstances are proven, and they are not outweighed by any proven mitigating circumstances. In *McCracken v. State,* 1994 OK CR 68, ¶¶ 34–37, 887 P.2d 323, 331–332, we held that even "a vicarious felony murderer may be sentenced to death absent an intent to kill, if sufficient aggravating circumstances exist." There were no dissents in the McCracken case — with one of the dissenters in the instant case concurring in the opinion, and the other concurring in the results — affirming McCracken's death penalty. Certainly that holding would be no less applicable in a case where a person "actually" kills a child, in violation of § 701.7(C), if "sufficient aggravating circumstances exist." *Id.*

The Supreme Court has held that a State may not sentence a defendant to death "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed," *Enmund v. Florida,* 458 U.S. at 797, 102 S.Ct. at 3376; *Cabana v. Bullock,* 474 U.S. at 378, 106 S.Ct. at 693, 88 L.Ed.2d 704. In 1987, *Tison v. Arizona,* 481 U.S. at 157–158, 107 S.Ct. at 1688, extended the *Enmund* rule to authorize the death penalty also for a felony-murder defendant who did not personally kill but "who was a major participant in a felony and exhibited reckless indifference to human life." *Tison* held: "Only a small minority of those jurisdictions imposing capital punishment for felony murder have rejected the possibility of a capital sentence absent an intent to kill, and we do not find this minority position constitutionally required." *Tison,* 481 U.S. at 158, 107 S.Ct. at 1688.

In *Enmund, Cabana v. Bullock,* and *Tison,* the Supreme Court addressed the applicability of the death penalty to an accomplice in a murder case who did not actually inflict the fatal wound. In Fairchild's case we have a defendant who himself, acting alone, actually killed. Therefore, the requirements of *Enmund, Cabana v. Bullock,* and *Tison* do not apply, and we need not determine whether Appellant was a "major participant in a felony and exhibited reckless indifference to human life" — he was the only participant. In *Wisdom v. State,* 1996 OK CR 22, ¶¶ 38–40, 918 P.2d at 395, we decided this precise issue, distinguishing *Tison* and *Enmund,* since Wisdom was the person who actually killed the three-year-old boy by "willful use of unreasonable force."

Today the two dissenting judges in *Fairchild* apparently wish to abandon their well reasoned holding in *Wisdom,* although one of them wrote *Wisdom,* and it was concurred in by the other. One of the dissenters now says the argument in *Wisdom* used a "remarkably facile analysis" and calls the opinion a "dubious pronouncement." To the contrary, we find *Wisdom* is in complete accord with current Supreme Court jurisprudence. One of the dissents says that *Cabana v. Bullock* itself makes no comment on the level of intent assumed in the Enmund rule. In fact, the *Enmund* rule (providing that one who actually kills, or attempts to kill, or intends that a killing take place or lethal force be employed, could be sentenced to death) was reiterated at least fourteen times in the majority opinion in *Cabana v. Bullock,* 474 U.S. at 378, 382, 383, 384, 385, 386 (twice), 387, 389, 390 (thrice), 391, 392, 106 S.Ct. at 693, 695, (twice), 696 (twice), 697 (thrice), 698, 699 (thrice), 699–700, 700, 88 L.Ed.2d at 711, 714 (twice), 715, 716 (thrice), 717, 718, 719 (thrice), 720 (twice).

In *Crawford v. State,* 1992 OK CR 62, ¶ 65, 840 P.2d 627, 640, we held that a jury need not specify whether the first degree murder conviction was based on malice aforethought or "during the commission of a felony," and need not make a finding of the defendant's intent to kill, "especially in light of the fact that [Crawford] acted alone in the commission of this offense." The *Crawford* interpretation of *Enmund* and *Tison* was unanimously cited with approval by this Court in *Powell v. State,* 1995 OK CR 37, ¶ 38, 906 P.2d 765, 776 (opinion by J. Strubhar), where we held that "Powell was not entitled to an *Enmund* instruction."

The United States Supreme Court decision in *Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 1742, 135 L.Ed.2d 36 (1996), cited in the

## ACCUMULATION OF ERRORS

¶ 101   In Proposition XVIII, Appellant argues the accumulation of errors requires reversal. We disagree. Given the uncontroverted and overwhelming evidence of guilt in this case, these errors, even in aggregate, do not warrant relief.

## MANDATORY SENTENCE REVIEW

¶ 102   In every capital murder case this Court conducts a final analysis to determine whether the evidence supports the jury's finding of aggravating circumstances, and whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. 21 O.S. 1991, § 701.13(C). We now conduct this mandatory sentence review.

¶ 103   The jury found one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel. 21 O.S.1991, § 701.12(4). We have previously found in Proposition XI sufficient evidence was presented to support the jury's finding of this aggravating circumstance.

¶ 104   The Court must also determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We have examined the impact of alleged trial error in this case. Given the overwhelming and uncontroverted evidence of guilt, we find any errors which may have occurred in the trial harm-

---

dissenting opinions, supports rather than contradicts our holding. The Supreme Court held that the President of the United States may prescribe aggravating factors in military capital cases. *Id.* at 754, 116 S.Ct. at 1742. We need not speculate about the meaning of questions asked by Supreme Court Justices at oral argument in the *Loving* case since we have the benefit of their final published opinions. All nine justices concurred in the judgment affirming Loving's death penalty. Loving had been convicted in a single trial of two separate murders and sentenced to death. One (under 10 U.S.C. § 918(1)) was premeditated murder, and one (under 10 U.S.C. § 918(4)) was felony murder. The underlying enumerated felony was robbery, which did not require an intent to kill nor an intent to injure. The only aggravator specified for the felony murder count was that Loving was the "actual perpetrator of the killing," or "triggerman." This aggravator, prescribed in a 1984 Executive Order by the President, was sufficient to save § 918(4) by genuinely narrowing the class of persons eligible for the death penalty. *Loving*, at 754, 116 S.Ct. at 1742; *citing Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988). Like *Loving*, Fairchild's case involves an accused who did the killing himself.

We need not comment on the majority opinion of the United States Court of Appeals for the Armed Forces on collateral review, cited by the dissents herein, as it has no precedential authority in this Court and is not required by the United States Supreme Court holdings in *Loving*, *Enmund*, *Cabana v. Bullock*, or *Tison.*

Two years later, in *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 1902–03, 141 L.Ed.2d 76 (1998), also cited by the dissenting opinions herein, the United States Supreme Court, by an 8–1 vote, affirmed the death penalty in a Nebraska case although neither the Nebraska felony murder statute nor the underlying felony, sexual assault, required proof of intent to kill or intent to injure.

In *Reeves*, the issue was whether *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), required a Nebraska court in a capitol felony-murder prosecution to instruct on offenses that state law did not recognize as lesser included offenses, not whether *Enmund* and *Tison* were satisfied. *Reeves*, 524 U.S. at 99, 118 S.Ct. at 1902. One of the dissents herein states: "The Supreme Court required this [*Enmund/Tison*] determination even though Hopkins [sic] was the actual killer." [Actually, Hopkins was the Warden; Reeves was the killer.] However, the Supreme Court did not require an *Enmund/Tison* determination. *Enmund* and *Tison* were only mentioned by the Supreme Court in *Reeves* because they had been relied upon by the erroneous lower court ruling. In fact the Supreme Court chided the Eighth Circuit Court of Appeals for relying on *Tison* and *Enmund* and requiring a *mens rea* with respect to the killing, when the only intent required for a felony murder conviction was the intent to commit the underlying felony:

"[T]he Court of Appeals read *Tison* and *Enmund* as essentially requiring the States to alter their definitions of felony murder to include a *mens rea* requirement with respect to the killing. In *Cabana v. Bullock* (citations omitted), however, we rejected precisely such a reading and stated that 'our ruling in *Enmund* does not concern the guilt or innocence of the defendant — it establishes no new elements of the crime of murder that must be found by the jury .... and does not affect the state's definition of any substantive offense.'" *Reeves*, 524 U.S. at 99, 118 S.Ct. at 1902.

Ironically, the Supreme Court pointed out that the Nebraska capitol felony-murder statute (under which they affirmed the death sentence) did not require proof of intent to kill, while instruction on non-capitol second-degree murder could be properly rejected by Nebraska courts because it required proof of precisely that additional element — intent to kill. *Id.*

less beyond a reasonable doubt. When we examine these errors individually, and in aggregate, we find they do not infect the trial with passion, prejudice, or any other arbitrary factor.

¶ 105 Finding no error warranting reversal or modification, the Judgment and Sentence of the District Court of Oklahoma County is **AFFIRMED**.

STRUBHAR, P.J., and CHAPEL, J., dissent.

LUMPKIN, V.P.J., and JOHNSON, J., concur.

STRUBHAR, Presiding Judge, Dissenting:

¶ 1 Because the majority chooses to depart from this Court's reasoned and well-settled precedent finding child abuse murder is a specific intent crime, I must dissent.[1] Hence, I remain unwavering in my opinion that the specific intent to injure is an element of child abuse murder including child abuse murder committed by the willful use of unreasonable force. *See Fairchild v. State,* 1998 OK CR 47, 965 P.2d 391, 403 (Lane, J. dissenting joined by Strubhar, V.P.J.). *See also Grady v. State,* 1997 OK CR 67, 947 P.2d 1069;*Bannister v. State,* 1996 OK CR 60, 930 P.2d 1176; *Hockersmith v. State,* 1996 OK CR 51, 926 P.2d 793.

¶ 2 Child abuse murder is nothing more than another form of felony murder, albeit in a section all by itself. *See Drew v. State,* 1989 OK CR 1, ¶¶ 13 & 15, 771 P.2d 224, 228 & 229; 21 O.S.Supp.1998, § 701.7(C). The mens rea element of child abuse murder, like other enumerated felonies, is supplied by the underlying felony which in this case is child abuse (10 O.S.Supp.1999, § 7115 formerly 21 O.S.1991, § 843) which requires the acts of abuse be committed willfully or maliciously. *See Drew,* 1989 OK CR 1, ¶ 13, 771 P.2d at 228. I recognize that the statutory definition of "willfully" as it applies to the intent with which an act is done or omitted, "implies

simply a purpose or willingness to commit the act or the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." 21 O.S.1991, § 92. In other words, "willfully" as defined in section 92 connotes general intent rather than specific intent. The terms "malice" and "maliciously" when used in a criminal statute mean "a wish to vex, annoy or injure another person, established either by proof or presumption of law." 21 O.S. 1991, § 95. Said definitions of "willfully" and "maliciously" are to be employed throughout Title 21 unless a different sense plainly appears. 21 O.S.Supp.1997, § 91.

¶ 3 In *Hockersmith,* 1996 OK CR 51, ¶¶ 10–12, 926 P.2d at 795, the Court held that it was plain error to instruct the jury that the term "wilful" required no intent to violate the law, or to injure another, or to acquire any advantage. We found the statutory definition employed in the jury instructions created conflict with the specific intent crime of child abuse. *Id.* In so holding, the Court correctly concluded the statutory definition of "willful" did not comport with the crime of child abuse and that a "different sense [of willful] plainly appeare[d]" in this context. 21 O.S.Supp.1997, § 91. This was made clear in *Bannister,* 1996 OK CR 60, ¶ 4, 930 P.2d at 1178, in which the Court followed *Hockersmith* and stated:

> We do not believe this is what the legislature intended when it defined child abuse and first degree child abuse murder as the "willful or malicious injuring, torturing, maiming or using of unreasonable force ... upon [a] child...." In 21 O.S.1991, § 91, the legislature provides that "[w]herever the terms mentioned in the following sections are employed in this chapter, they are deemed to be employed in the senses hereafter affixed to them, except where a different sense plainly appears." While 21 O.S.1991, § 92 then provides that a person may act "willfully" and yet not intend to injure, "a different sense of [the term 'will-

---

1. Although I believe this case is not procedurally proper for rehearing, *see* Rule 3.14(B), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (1999) and *Fairchild v. State,* 1999 OK CR 30, 992 P.2d 349 (Strubhar, P.J. dissenting), I choose to focus my remarks on the merits.

In my opinion since the original opinion was withdrawn, this opinion constitutes the opinion in this matter and both parties have the right to pursue further review in accordance with this Court's rules.

fully'] plainly appears" when it is used in the statutes on child abuse and first degree child abuse murder. As employed in those statutes, the term willful—used interchangeably with malicious—must require an intent to injure if the mens rea element for those crimes is to make any sense. (footnotes omitted)

¶ 4 In *Grady*, 1997 OK CR 67, ¶ 6, 947 P.2d at 1071, the Court held the improper statutory definition of "willful" did not warrant reversal and was not plain error since Grady's jury was properly instructed on the elements of the crime of child abuse murder, including the requirement of an intent to injure. Regardless of the Court's decision concerning the impact of an erroneous definition of "willful" in the jury instructions in these cases, one unmistakable finding in *Hockersmith, Bannister* and *Grady* remains—child abuse, and consequently child abuse murder, are specific intent crimes requiring an intent to injure.

¶ 5 In *Revilla v. State*, 1997 OK CR 48, ¶ 5, 946 P.2d 262, 265, the Court stated that "[t]he decision in *Hockersmith* merely *applied established law* to the particular facts of the case" (emphasis added) and therefore the claim challenging the jury instruction defining "willful" could not be reviewed on the merits on post-conviction because *Hockersmith* was not an intervening change of law. The established law relied on was *Revilla*,[2] itself, and *Watkins v. State*, 1987 OK CR 215, 744 P.2d 967, 970. In *Revilla*, the Court found the jury instructions utilizing the mens rea of "willfully" or "maliciously" "adequately informed [the jury] of the State's burden to prove that the [child's] death … was intentional." *Revilla*, 1994 OK CR 24,

¶ 14, 877 P.2d at 1149. In *Watkins*, the Court dismissed Watkins' conviction for child abuse because Watkins' conduct toward the child only showed a reckless disregard for human life rather than an intent to injure as mandated by the "clear and readily understandable" statutory language. *Watkins*, 1987 OK CR 215, ¶ 14, 744 P.2d at 970. Based on the above precedent, I see no need to retreat from our prior decisions finding child abuse and child abuse murder specific intent crimes.[3]

¶ 6 Also troubling is the majority's holding that a general intent crime is death eligible without any finding of culpability. This holding allows for the imposition and carrying out of the death penalty on a person who, without any intent to injure much less intent to take the life of a child, nonetheless somehow causes the death of that child. The majority relies on *Wisdom v. State*, 1996 OK CR 22, ¶ 40, 918 P.2d 384, 395 for its holding. *Wisdom* was a child abuse murder case decided five months prior to *Hockersmith* when the Court was functioning under the belief and law that child abuse murder was a specific intent crime as evidenced by its prior decisions and subsequent *Hockersmith* decision. See *Revilla*, 1994 OK CR 24, ¶ 14, 877 P.2d at 1149; *Watkins*, 1987 OK CR 215, ¶ 14, 744 P.2d at 970. In reviewing a claim that Wisdom was entitled to *Enmund/Tison*[4] instructions, the *Wisdom* court distinguished and strictly construed the *Enmund* holding, concluding culpability instructions were not necessary in the second stage of a capital child abuse murder case where the defendant actually committed intentional abuse.

2. *Revilla v. State*, 1994 OK CR 24, 877 P.2d 1143, *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995).

3. I cannot agree that the isolated reference in *Workman v. State*, 1991 OK CR 125, ¶ 22, 824 P.2d 378, 383, *cert. denied*, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992), may serve as this Court's sweeping pronouncement that child abuse murder is a general intent crime in light of our more definitive cases on the subject matter.

4. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d

127 (1987). In *Enmund*, 458 U.S. at 797, 102 S.Ct. at 3376, the Supreme Court held that a defendant cannot receive a sentence of death for felony murder committed by an accomplice unless the defendant knew the killing would take place, knew lethal force would be used, killed, or attempted killing. In *Tison*, 481 U.S. at 158, 107 S.Ct. at 1688, the Supreme Court modified *Enmund* holding that a defendant who was a major participant in the felony committed, who displayed reckless indifference to human life, may be sufficiently culpable to receive the death penalty. See also *Allen v. State*, 1994 OK CR 30, ¶ 15, 874 P.2d 60, 64.

¶ 7 Two recent decisions from the United States Supreme Court counsel that a culpability assessment, i.e. a finding of intentional harm, must be made at some point in the process for the death penalty to be constitutionally sound in felony murder cases where intent to kill is not an element of the crime even if the defendant is the actual killer. This constitutes an expansion of *Enmund/Tison* but is consistent with Eighth Amendment jurisprudence because any capital sentencing scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).

¶ 8 In *Hopkins v. Reeves,* 524 U.S. 88, 90–91, 118 S.Ct. 1895, 1898, 141 L.Ed.2d 76 (1998), the Court held that *Beck*[5] does not require state trial courts to instruct juries on offenses that are not lesser include offenses of the charged crime under state law. In so holding, the Court found that the states are not constitutionally required to include a mens rea requirement with respect to killing in their definitions of felony murder so long as an *Enmund/Tison* culpability assessment is performed before the death penalty is imposed. *Reeves,* 524 U.S. at 100, 118 S.Ct. at 1902. In *Loving v. United States,* 517 U.S. 748, 773–74, 116 S.Ct. 1737, 1751, 135 L.Ed.2d 36 (1996), the Supreme Court held the President had the delegated authority to prescribe aggravating circumstances for the military capital punishment scheme to maintain the constitutional validity of it. The additional aggravating factors establishing a higher degree of culpability were necessary "to save" the military's death eligible felony murder statute because the Code of Military Justice article criminalizing felony murder required no specific intent to kill. *Loving,* 517 U.S. at 756, 116 S.Ct. at 1742.

¶ 9 Following the Supreme Court's decision and its voiced concerns during oral argument about the imposition of the death penalty on felony murder defendants whose crimes required no intent to kill, Loving sought further review of his conviction and death sentence. He argued in part that the military article defining felony murder was constitutionally infirm as a capital offense because it did not require an intent to kill and such defect could not be remedied because he was the actual killer or triggerman. *Loving v. Hart,* 47 M.J. 438, 441 (U.S.Ct. App. Armed Forces 1998), *cert. denied,* 525 U.S. 1040, 119 S.Ct. 590, 142 L.Ed.2d 533 (1998). Because neither *Enmund* nor *Tison* involved actual killers, the *Loving* Court considered "whether a person who 'actually killed' may be sentenced to death absent a finding that the person intended to kill." *Loving,* 47 M.J. at 443. The *Loving* court stated:

> Without speculating on the views of the current membership of the Supreme Court, we conclude that when *Enmund* and *Tison* were decided, a majority of the Supreme Court was unwilling to affirm a death sentence for felony murder unless it was supported by a finding of culpability based on an intentional killing or substantial participation in a felony combined with reckless indifference to human life. Thus, we conclude that the phrase, "actually killed" as used in *Enmund* and *Tison,* must be construed to mean a person who intentionally kills, or substantially participates in a felony and exhibits reckless indifference to human life.

*Id.* The Supreme Court declined further review of this issue that it voiced such concerns about during oral argument denying Loving's petition for a writ of certiorari. *Loving v. Hart,* 525 U.S. 1040, 119 S.Ct. 590, 142 L.Ed.2d 533 (1998).

¶ 10 Like in *Loving,* we are bound by the requirement of *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742, to "genuinely narrow the class of persons eligible for the death penalty" and this can only be done in child abuse murder cases if the defendant's level of culpability is part of the narrowing process. *See Loving,* 47 M.J. at 444. As stated above, the better solution is to follow our established precedent holding child abuse murder is a specific intent crime and avoid the *Enmund/Tison* problem altogether as we did in *Wisdom.* Barring the return to our prior holdings that

**5.** *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

child abuse murder is a specific intent crime, child abuse murder under 21 O.S.1991, § 701.7(C) can pass constitutional muster as a capital offense only if it is combined with our statutory aggravating circumstances (none of which concern the defendant's culpability for the murder) and the culpability requirements of *Enmund/Tison*. Combining these factors in assessing punishment reasonably justifies the imposition of the more severe sentence of death on the defendant vis a vis others found guilty of murder thereby satisfying *Zant*.

¶ 11 To maintain the constitutional validity of Oklahoma's capital sentencing scheme in child abuse murder cases, a culpability assessment must be made at some point in the process to determine if the defendant intentionally killed or participated in the child abuse exhibiting a reckless indifference to human life. While I would rather have the sentencer who hears all the evidence and sees the witnesses first hand make this determination, I recognize that such a finding may be made on appeal. *Cabana v. Bullock*, 474 U.S. 376, 392, 106 S.Ct. 689, 700, 88 L.Ed.2d 704 (1986) Accordingly, this Court should either mandate that capital sentencing juries make this determination or undertake such a culpability assessment in future child abuse murder cases where the death penalty is imposed to ensure the ultimate penalty is exacted on the small class of murderers who "are deemed the worst of the worst murderers." *Cheney v. State*, 1995 OK CR 72, ¶ 9, 909 P.2d 74, 78. By making child abuse murder a general intent crime and holding no *Enmund/Tison* culpability assessment is required for child abuse murder defendants, the majority paves the way for a higher court to strike down the death penalty in this and other horrific cases simply to affirm the instant case. As I cannot join the majority in this endeavor, I dissent.

CHAPEL, Judge, Dissenting:

¶ 1 This case was argued before this Court almost two years ago and an opinion was issued deciding the case over a year ago.[1] The decision affirming was a *per curiam* opinion with three judges concurring in result and two judges dissenting. The case was a difficult one for two reasons: (1) the facts are just horrible, and (2) the question of whether Fairchild was entitled to a voluntary intoxication instruction was close. I voted to concur in result in the original opinion affirming this case. That vote was based upon a very, very narrow resolution of the intent issue. The majority on rehearing unnecessarily and erroneously expands the resolution of that issue. Consequently, I dissented to the majority's decision to grant relief on Fairchild's Petition for Rehearing and to withdraw the opinion handed down in this case on August 20, 1998. I further dissent to the decision in the Opinion on Rehearing denying Fairchild relief.[2] I have concluded our case law clearly holds that child abuse murder by willful use of unreasonable force [3] is a specific intent crime. I would reverse and remand the case for the proper instructions on voluntary intoxication.

¶ 2 The majority appears to have withdrawn the original opinion in this case solely in order to revisit the issue of intent for the crime of child abuse murder by willful use of unreasonable force. That proposition was not properly raised in Fairchild's petition for rehearing and cannot serve as a basis to revisit that question. Our rules clearly limit relief on rehearing to (1) questions submitted on direct appeal which were overlooked in the original opinion, or (2) decisions conflicting with express statutes or controlling authority not brought to this Court's attention during the pendency of the appeal.[4] On the issue of intent, the original opinion discussed a previously uninterpreted section of the child abuse murder statute. I discuss the majority's mistaken conclusion otherwise below. As the original opinion neither overlooked nor failed to apply controlling authority, there is no avenue through which this

---

1. January 13, 1998 and August 20, 1998.

2. I agree with Judge Strubhar that, as the original opinion was withdrawn, this constitutes the opinion in this case and both parties may pursue further review in accordance with our Rules.

3. 21 O.S.1991, § 701.7(C).

4. Rule 3.14, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1999).

Court may properly reach the issue of intent on a petition for rehearing.

¶ 3 The narrow question raised in *Fairchild* is whether "willful use of unreasonable force" requires specific intent. If so, Fairchild was entitled to an instruction on voluntary intoxication and the case should be reversed. If not, this Court has held a general intent crime is eligible for the death penalty without any finding of intent to injure or kill, or any showing of reckless disregard or indifference to the value of human life.

¶ 4 The majority concludes that child abuse murder is a general intent crime. However, this conclusion creates not only a logical anomaly, but a serious constitutional error. This Court cannot and should not make a general intent crime eligible for the death penalty. The majority merely concludes that a defendant who actually kills may be death-eligible without any finding of intent to kill or even injure. This conclusion is constitutionally unsound. The Supreme Court has never upheld such a conclusion and has strongly indicated it will not so rule.

¶ 5 The only legitimate analysis finding a general intent crime death-eligible rests on a comparison with the law of felony murder. Most capital punishment states provide the death penalty for certain murders occurring in the course of enumerated felonies, and the intent to commit the underlying felony is sufficient to support the conviction for murder. The Supreme Court has held that such convictions may result in death-eligibility only if there is a determination that (a) the defendant intended life be taken or contemplated that lethal force would be used,[5] or (b) the defendant had substantial personal involvement in the underlying felony and exhibited reckless disregard or indifference to the value of human life.[6] This *Enmund/Tison* formula is necessary before a felony

murder defendant may be eligible for the death penalty.

¶ 6 The majority does not explicitly make the felony-murder analogy, but the opinion relies on *Wisdom v. State*.[7] Wisdom beat his stepson to death and was convicted of child abuse murder by "use of unreasonable force." We rejected Wisdom's *Enmund/Tison* argument using a remarkably facile analysis. We noted that *Enmund* and *Tison* both involved defendants who aided and abetted and determined that, since Wisdom actually committed the murder himself, those cases did not apply. Thus this Court never reached the issue of intent necessary to support death-eligibility. This reasoning did not lead to Wisdom's execution since we reversed the death conviction and remanded the sentence on other grounds. Thus, the United States Supreme Court did not have the opportunity to review this dubious pronouncement.

¶ 7 The majority suggests *Wisdom* comports with Eighth Amendment jurisprudence and cites *Cabana v. Bullock*.[8] In fact *Cabana* does not support this holding. The issue in *Cabana* was at what point an *Enmund* finding of culpability must be made. The opinion relies on the *Enmund* formulation that somewhere in the process there must be a determination that the defendant is personally culpable and intentionally caused harm.[9] As *Enmund* states, "It is fundamental that 'causing harm intentionally must be punished more severely than causing the same harm unintentionally.'"[10] In the quote cited by the majority, *Cabana* describes *Enmund* as stating the categorical rule, imposing a substantive limit on the imposition of the death penalty, that "a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death."[11] Cabana also notes *Enmund* is not concerned with

5. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

6. *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

7. 1996 OK CR 22, 918 P.2d 384.

8. 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986).

9. *Enmund*, 458 U.S. at 798, 102 S.Ct. at 3377.

10. *Id.* (quoting H. Hart, *Punishment and Responsibility* 162 (1968)).

11. *Cabana*, 474 U.S. at 386, 106 S.Ct. at 697.

guilt or innocence and establishes no elements of any particular capital crime.[12] Cabana itself makes no comment on the level of intent assumed in the *Enmund* rule.

¶ 8 In *Enmund, Tison,* and *Cabana,* the Court was concerned with the choice between a defendant with no finding of personal culpability for murder, and a defendant who had intentionally killed. *Enmund* refers to one who actually kills intentionally, noting that the death penalty "can serve as a deterrent only when murder is the result of premeditation and deliberation."[13] None of these cases contemplated the issue in *Fairchild* : a defendant who actually killed without any finding of specific intent to kill or injure. In *Hopkins v. Reeves,*[14] the Supreme Court reiterated *Cabana's* holding that state courts must at some point make an *Enmund/Tison* determination of personal culpability for a felony-murder defendant.[15] The Supreme Court required this determination even though Hopkins was the actual killer.

¶ 9 In *Loving v. United States,*[16] the Supreme Court held that, without the addition of aggravating factors, a Code of Military Justice article authorizing the death penalty for felony murder was not sufficiently narrow under *Enmund* where there was no determination that the defendant intended to kill or actually killed.[17] Loving was the triggerman in that felony-murder case. Although *Loving* was not resolved on the issue of intent, this was clearly of concern to several Justices during oral argument. At one point Justice Scalia told petitioner's counsel, "*Enmund* I think supports your position there, that you can't automatically transpose the *mens rea*

for a felony to a killing and still have capital punishment for it."[18] One Justice asked the Solicitor General, "Was it clear in this case that it was the felony aspect of the homicides committed with premeditation that were the aggravators?" Later a Justice asked:

> [I]s there a—an intent to kill requirement in section 918?
>
> . . . .
>
> Accidental killing would be enough to impose the death penalty under [Art. 118, 10 U.S.C. § 918(4)]?
>
> . . . .
>
> Suppose I drop a gun during a holdup. The gun[ ] goes off and kills somebody. Is that enough to satisfy the requirements of 10 U.S.C. [§] 918(4)[19]

The Solicitor General argued that, although the felony-murder statute lacked sufficient intent to satisfy the Eighth Amendment requirements for death-eligibility, the Government relied on the aggravating factor that Loving was the triggerman. The Justice continued:

> Yes, but that still doesn't get you to intent and the aggravating factor isn't an element. . . .
>
> . . . .
>
> [I]t may limit [the imposition of the death penalty] but it doesn't provide the missing element. . . .
>
> . . . .
>
> The triggerman can do it accidentally.[20]

The Solicitor General replied that the introduction to the statute said "unlawfully kills",

12. *Id.,* 474 U.S. at 385, 106 S.Ct. at 696.

13. *Enmund,* 458 U.S. at 799, 102 S.Ct. at 3377.

14. 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998). The issue in *Hopkins* was whether state courts must instruct on offenses which are not lesser-included offenses of the charged crime.

15. *Id.,* 524 U.S. at 99, 118 S.Ct. at 1902.

16. 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). The issue in *Loving* was whether the President could prescribe the necessary aggravating factors without violating the separation of powers doctrine. After this decision Loving sought mandamus relief from the United States Court of Appeals for the Armed Forces. That

court held the felony-murder provisions of the Uniform Code of Military Justice Article 118(4) were constitutional only when combined with an aggravating factor sufficient to meet both the capital narrowing requirements and the *Enmund/Tison* culpability requirements. *Loving v. Hart,* 47 M.J. 438, 444 (U.S.Ct.App. Armed Forces 1998).

17. *Id.,* 517 U.S. at 756, 116 S.Ct. at 1742.

18. *Loving v. U.S.,* No. 94–1966, 1996 WL 13954, at *11 (U.S.Oral.Arg. Jan. 9, 1996).

19. *Id.* at *34.

20. *Id.* at *35.

and commented, "[T]here would have to be presumably some level of culpability, recklessness or gross negligence or something like that."[21]

¶ 10  Later Justice Scalia returned to the intent question and said it appeared, under the statute, "You can perpetrate the killing without intending to kill."[22]  The Solicitor General agreed there was no statutory intent to kill requirement, and Justice Scalia said, "[A]s it now stands, I guess that means [§] 118(4) is invalid, constitutionally invalid [as to the death penalty]."[23]  Another Justice added,

> ... I'm, with Justice Scalia, somewhat confused because of the—[§] 118(4) does permit conviction of a person engaged in robbery who, let's say, negligently and therefore unlawfully without excuse or justification kills someone else.  And that, provided he's the person who did it negligently and therefore unlawfully, would permit the imposition of the death penalty.[24]

¶ 11  This exchange suggests the Court will look with disfavor on any attempt to make a general intent crime death-eligible without at least an *Enmund/Tison* review of personal culpability.  The majority provides for no such review and rejects Fairchild's *Enmund/Tison* claim of error.  Under the Court's decision today, Fairchild is convicted of a general intent crime and unconstitutionally made eligible for the death penalty without any finding of intent.  I would avoid this problem completely by following our well-settled law holding child abuse murder is a specific intent crime.  If properly convicted, Fairchild and any other child abuse murder defendant will not need *Enmund/Tison* instructions since the jury will already have made a determination regarding personal culpability.

¶ 12  The bulk of the majority discussion is devoted to proving that "willful use of unreasonable force" is a general intent crime.  This requires fourteen pages in which the majority selectively cites from general intent cases and attempts to distinguish or explain our prior cases deciding this issue.  The majority opinion also suggests the Legislature has deliberately kept redundant or unnecessary language in every amendment to the child abuse murder statutes.  We have consistently held the statutory language for the underlying statute of child abuse requires the specific intent to injure.[25]  The majority insists that our previous use of the phrase "intent to injure" does not mean what it says.  The majority holds that the entire child abuse murder statute, even the provisions prohibiting malicious conduct, encompasses only general intent.  In an unnecessarily sweeping pronouncement the majority of this Court now negates all our previous case law on this issue.

¶ 13  The majority "clarifies" our previous cases by suggesting that the "intent to injure" requirement in each means only that the State must prove a general intent to commit the act leading to the child's injury or death.  A brief review of the cases shows this is a fruitless enterprise.  These extremely plain holdings need no clarification.

¶ 14  In *Watkins v. State*[26] the defendant was charged with injury to a minor child: the child was injured when the defendant fired a shotgun through a window and killed someone else.  We held the evidence showed only reckless disregard for human life as directed to the child victim since there was no "intent to injure, torture, or maim as mandated by the statute. The statutory language being *clear and readily understandable*, we find the element of intent lacking in the present

---

21.  *Id.* at *36.

22.  *Id.* at *51.

23.  *Id.*

24.  *Id.* at *52–53.

25.  *Grady v. State*, 1997 OK CR 67, 947 P.2d 1069, 1070–71; *Bannister v. State*, 1996 OK CR 60, 930 P.2d 1176; *Hockersmith v. State*, 1996

OK CR 51, 926 P.2d 793, 795; *Revilla v. State*, 1994 OK CR 24, 877 P.2d 1143, *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); *Watkins v. State*, 1987 OK CR 215, 744 P.2d 967.

26.  1987 OK CR 215, 744 P.2d 967.

case."[27]

¶ 15 *Revilla v. State* [28] charged child abuse murder through "use of unreasonable force." The majority inexplicably suggests *Revilla* held the State was not required to prove "intent to injure." On the contrary, the Court cited *Drew v. State*,[29] further discussed below, to support its holding that child abuse murder has a specific intent requirement of intent to injure.[30] *Revilla* also specifically found the instructions were adequate to tell the jury the State was required to prove the victim's death was intentional,[31] and found other crimes evidence admissible to show the defendant's intent to injure the victim.[32]

¶ 16 In *Hockersmith v. State* [33] we held it was error to instruct that "willful" required no intent to injure where the jury was not also instructed on the "intent to injure" element of child abuse murder. Again, the Court cited *Drew* regarding the requirement of a specific intent to injure. [34] Bannister v. State [35] reemphasized the *Hockersmith* decision and specifically found, "As employed in [the child abuse and child abuse murder] statutes, the term willful—used interchangeably with malicious—must require an intent to injure if the *mens rea* element for those crimes is to make any sense."[36] Following *Hockersmith*, *Grady v. State* [37] held that the child abuse murder statute required intent to injure and any instruction defining "willful" as requiring no intent to injure was confusing. However, the Court found where the jury was otherwise adequately instructed on the "intent to injure" element, the error in instruction did not automatically require reversal. These cases show an unbroken commitment to the legal interpretation that the legislature intended to made child abuse murder a specific intent crime.

¶ 17 The majority claims *Workman v. State* [38] disposes of the issue of intent for child abuse murder. The entire *Workman* discussion of the *mens rea* requirement for child abuse murder follows:

Appellant also complains that § 701.7(C) lacks any *mens rea*. We again must disagree. The intent for § 701.7(C) is found in 21 O.S. § 843 under the general intent of 'willfully' or 'maliciously'. See *Drew v. State*, 771 P.2d 224, 228 (Okl.Cr.1989). This assignment of error lacks merit.[39]

¶ 18 This brief discussion does not appear to use the phrase "general intent" as a term of art, but as an answer to the question whether the child abuse murder statute contains any intent element at all. Although *Workman* relies on it, the Fairchild majority neither cites nor discusses *Drew*. As cited in *Workman*, *Drew* stated:

Section 843 clearly provides that only those acts which are committed in a willful or malicious manner fall within the purview of the statute. Because the *mens rea* element of Section 701.7(C) is supplied by Section 843, we find that this argument lacks merit.[40]

*Drew* also states:

Where the prosecution attempts to utilize Section 701.7(C) for a murder conviction, it must first establish that all of the elements of child abuse under 21 O.S.1981, § 843 are proved beyond a reasonable doubt. Included among those elements is the requirement that the acts be committed in a

27. *Id.* at 970 (emphasis added).

28. 1994 OK CR 24, 877 P.2d 1143, *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995).

29. 1989 OK CR 1, 771 P.2d 224, 228.

30. *Revilla*, 877 P.2d at 1148.

31. *Id.* at 1149.

32. *Id.* at 1152.

33. 1996 OK CR 51, 926 P.2d 793.

34. *Id.* at 795.

35. 1996 OK CR 60, 930 P.2d 1176.

36. *Id.* at 1178.

37. 1997 OK CR 67, 947 P.2d 1069.

38. 1991 OK CR 125, 824 P.2d 378, *cert. denied*, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992).

39. *Id.* at 383 (emphasis added).

40. *Drew*, 771 P.2d at 228.

willful or malicious manner. Therefore, the adoption of the *mens rea* requirement of Section 843 does not alter the State's ultimate burden of proving each element of Section 701.7(C) beyond a reasonable doubt.[41]

*Drew* does not support *Workman*'s broad statement that § 843 [now § 7115] is a general intent crime. In fact, it does not decide that issue and holds merely that § 843 and § 701.7(C) combined have an unspecified *mens rea* element. I submit the more reasonable reading is contained in *Revilla* and *Hockersmith*, which interpreted *Drew* to require a specific intent.

¶ 19 The defendant in *Workman* was convicted of first degree child abuse murder. From the opinion it is impossible to tell what particular prohibited act gave rise to the charge. However, on its face the opinion appears to refer to a specific intent crime. Our legislature has clearly defined "malicious" as denoting a specific intent crime.[42] The majority attempts to get around this by reciting the definition of "malice" required for a first degree malice murder conviction under § 701.7(A). The opinion compares this definition with "malicious." The majority suggests that either (a) the § 701.7(C) prohibition against child murder *by malicious conduct* incorporates the § 701.7(A) use of "malice" murder, or (b) the legislative definition of "malicious" does not apply to child abuse murder because § 701.7(A) uses "malice." Not only is this incorrect, it is directly opposed to the majority's thesis, since malice murder requires a specific intent to kill. Section 843, under which Workman and Fairchild were charged, prohibited willful or malicious injury, torture, maiming or use of unreasonable force.[43] As *Workman* does not say whether the charged conduct was alleged to be "willful" or "malicious," this Court must assume both statutory terms were used.

¶ 20 The majority apparently realizes the appearance of inconsistency in finding that some parts of the child abuse murder statute require specific intent (i.e., all our previous case law) while one portion requires only general intent. The majority solution is to insist that both "willful" and "malicious" denote only general intent. Not surprisingly, none of the majority's cited cases support this proposition. As I note above, our legislature has defined "malicious" as a specific intent crime.

¶ 21 The crux of the majority argument is that "willful" always denotes general intent. The opinion tendentiously discusses general intent cases in which the term "willful" appears even peripherally, or may be inferred to appear. As the discussion below notes, all these cases collectively represent the unsurprising conclusion that, for a general intent crime, the word "willful" requires only a general intent.

¶ 22 In defending its conclusion regarding intent, the majority cites one of many cases in which this Court has distinguished between general and specific intent. In the syllabus, *Vandiver v. State*[44] says:

> 4. Two general classes of "intent" exist in the criminal law, a so-called "general intent" which must exist in all crimes, and a further mental element known as the "specific intent" which is essential to particular crimes.

This sentence appears nowhere in the *Vandiver* opinion, which discusses only specific intent. The defendant in *Vandiver* was convicted of assault with intent to kidnap, and the issue at trial was whether the State showed he had the intent to secretly confine the victim. We noted intent was an element of the crime of kidnapping, and determined insufficient evidence existed because the Court would have to speculate on what the defendant might have done. "The law will

---

41. *Id.*

42. "The terms 'malice' and 'maliciously,' when so employed, import a wish to vex, annoy or injure another person, established either by proof or presumption of law." 21 O.S.1991, § 95. The majority cites no case in which this Court has held "malicious" denotes a general intent.

43. The current statute contains the same prohibition. 10 O.S.Supp.1995, § 7115.

44. 97 Okl.Cr.217, 261 P.2d 617, 619 (1953), *reversed in part on other grounds by Parker v. State*, 1996 OK CR 19, 917 P.2d 980.

not presume an intention beyond that realized by the act."[45]

¶ 23  The majority uses the *Vandiver* syllabus to conclude that the child abuse murder statute has no further mental element requiring specific intent. To support this dubious conclusion the majority must find "willfully or maliciously" refers to general intent only, even in the context of murder. The majority cites *Kreijanovsky v. State*[46] for the argument that "willful" and "malicious" denote general intent crimes and do not require proof of specific intent. Kreijanovsky was convicted of Second Degree Burglary and arson. This Court determined the trial court did not err in failing to instruct *sua sponte* on the issue of voluntary intoxication because

> [A]rson is not a specific intent crime, and voluntary intoxication is available as a defense only when the crime with which the defendant is charged has as its *mens rea* element a specific criminal intent or a special mental element. See 21 O.S.1981, § 1401 and *Boyd v. State*, 572 P.2d 276 (Okl.Cr.1977), respectively.[47]

There is no discussion suggesting that either "willful" or "malicious" refer only to general intent crimes. The only possible way to infer this from this case is that, a few paragraphs later, discussing a different proposition, the opinion cites the arson statutes, which prohibit a person from "willfully and maliciously" burning inhabited or uninhabited property. While this may be a reasonable inference (for the term "willful" only), it is exactly the kind of implied dicta on which we ought not to base sweeping pronouncements.

¶ 24  The majority argues it is "helpful" to look at the use of "willful" in cases dealing with general intent crimes, such as assault and manslaughter. On the contrary, those cases do not support the contention that the word "willful" automatically confers general

intent status on an offense. In *State v. Madden*[48] the issue was whether the phrase "great bodily injury" in the aggravated assault statute was void. This Court held it was not, and noted incidentally that specific intent was not an element of aggravated assault, as general intent was presumed from the act. The term "willful" is not an issue in the discussion of either the constitutional issue or the dicta on intent. *Madden*, and the majority, rely on *Quinn v. State*,[49] in which we distinguished aggravated assault and battery from the greater offense of assault and battery with intent to do bodily harm. *Quinn* noted the well-settled law of intent:

> "Generally speaking, to constitute a crime the act must, except as otherwise provided by statute, be accompanied by a criminal intent on the part of the accused, or by such negligent and reckless conduct and indifference to the consequences of conduct as is regarded by the law as equivalent to a criminal intent."[50]

We found sufficient evidence of general intent where Quinn "intentionally," "willfully and deliberately" fired a gun.

¶ 25  In *Tarver v. State*[51], this Court construed the meaning of "willful" in the manslaughter statute prohibiting willful killing of an "unborn quick child." We said "willful" is equivalent to "knowing," cited the statute defining "willful" as implying a purpose or willingness to commit the act,[52] and concluded the term refers to the defendant's subjective state of mind (intending to inflict injury with awareness that death of the child would likely result) and requires no specific intent to kill. We relied on *Lamb v. State*,[53] in which a defendant was charged with willful failure to provide. There we held "in this connection" willful was the same as know-

45.  *Vandiver*, 261 P.2d at 625.

46.  1985 OK CR 120, 706 P.2d 541.

47.  *Id*. at 544 (emphasis added). *Boyd* held rape did not require a specific intent. *Boyd*, 572 P.2d at 278.

48.  1977 OK CR 155, 562 P.2d 1177, 1180.

49.  485 P.2d 474 (Okl.Cr.1971).

50.  *Id*. at 476.

51.  1982 OK CR 156, 651 P.2d 1332, 1334–35.

52.  21 O.S.1991, § 92.

53.  1956 OK CR 17, 293 P.2d 624.

ing.[54] The majority compares *Tarver* with *Miller v. State*.[55] Construing federal manslaughter law, this Court held the trial court properly instructed that "willfully" meant to intentionally, designedly or without lawful excuse commit the act causing an injury resulting in death.[56] This, of course, merely restates the definition of manslaughter.

¶ 26 Turning to the child abuse murder statute itself, the majority compares "willful injury" with "willful use of unreasonable force" to suggest the preface "willful" denotes general intent. The majority argues "willful injury" is the same as "willful killing" in manslaughter, a crime which has no specific intent element. The majority relies on *Holder v. State*[57] to suggest the "use of unreasonable force" equals battery (the willful and unlawful use of force).[58] *Holder* compared battery with § 843 child abuse provisions and determined that under the circumstances of that case the only differing element was the § 843 requirement that the victim be less than 18 years old.[59] This says nothing beyond the facts of that case.

¶ 27 In an effort to support its claim that child abuse murder requires only general intent, the majority engages in an irrelevant semantic exercise. The opinion examines various criminal statutes, apparently at random, and determines that several specific intent crimes contain the word "intent" in the statutory language, while several general intent crimes do not. The opinion concludes that neither § 843 nor § 701.7(C) contains the word "intent" so both must be general intent crimes. This attempt at quantitative analysis is neither legitimate statutory interpretation nor legal analysis. One might as well count the times the legislature used "the."

¶ 28 The majority appears to rely on *Morse v. State*[60] for its claim that voluntary intoxication instructions were not required here. The majority notes *Morse* held that intoxication was not a defense to the crime of child beating, and implies that Fairchild failed to cite the case in the vain hope that the Court would overlook it. It is far more likely that Fairchild failed to cite it because it is both irrelevant and an inaccurate statement of settled law. *Morse* was charged with child beating under the precursor to 21 O.S.1991, § 843. In denying his claim the Court stated, "Intoxication is no defense to any crime. . . . ."[61] The majority's cited cases show that to be untrue; voluntary intoxication is certainly a defense to all crimes requiring a defendant to form a specific intent to commit an act. Further, the child abuse statute no longer contains the language under which Morse was charged. Finally, a case deciding whether intoxication is a defense to battery on a child is of remarkably little value in determining the appropriate *mens rea* where the issue is intent to injure and the victim is dead.

¶ 29 The majority disregarded our rules in order to grant Fairchild's petition for rehearing, withdraw the opinion, and expand the narrow holding on the intent necessary for child abuse murder. In doing so, the majority rejects settled law, recasts child abuse murder as a general intent crime, and makes a general intent crime death-eligible. I dissent.

**54.** *Id.* at 630.

**55.** 9 Okla.Crim.55, 130 P. 813 (1913).

**56.** *Id.* at 814.

**57.** 1976 OK CR 288, 556 P.2d 1049.

**58.** 21 O.S.1991, § 642.

**59.** *Holder*, 556 P.2d at 1052.

**60.** 1968 OK CR 51, 438 P.2d 309.

**61.** *Id.* at 310. Not surprisingly, *Morse* has only been cited once since publication, and that was not for this extremely dubious discussion.